OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1906.

*(Continued from Volume 198.)*

CANTWELL et al. v. COLUMBIA LEAD COM-
PANY et al., Appellants:

Division One, October 19, 1906.

1. **BILL OF EXCEPTIONS: Change of Venue: Place of Filing.**
A bill of exceptions filed in a court to which a change of venue
is taken will not save exceptions in the court from which the
change is taken. So that where defendants filed a motion to
revoke the appointment of a receiver and on the same day filed
their answer on the merits in an injunction suit, and, the motion
to revoke being heard and overruled, appealed, and were given
time in which to file a bill of exceptions, and before that time
expired took a change of venue on the merits to another county
presided over by another judge, their bill of exceptions filed in
the circuit court of the latter county does not preserve the ex-
ceptions for review. The bill should have been filed in the
county where the motion was heard.

2. ———: ———: **Interlocutory Order: Jurisdiction.** When an ap-
peal has been taken to an appellate court from an interlocutory
order or judgment, the right to take all medium or necessary
steps for perfecting that appeal remains in the court granting
the appeal, though after the order granting the appeal the prin-
cipal cause is sent on a change of venue to some other court.

3. ———: **Receivership: Motion to Revoke.** A motion to revoke
the order appointing a receiver is no part of the record proper.
It can be made a part of the record only by being incorporated
in a bill of exceptions, and by filing that in the proper court,
and making the whole a part of the record in the cause.

199 Sup.—1                                                    ( 1 )

4. **RECEIVER: Attempt to Wreck Company: Sufficient Pleading.** A petition which discloses a scheme on the part of the majority of the directors of a corporation, some of them mere nominal stockholders, to wreck the corporate property in the interest of a wrongful combination of a majority of the stockholders with a majority of such board of directors, the scheme including mismanagement by which debts are needlessly made, and a purpose by the majority stockholders to mortgage the property so that upon its foreclosure they may buy the property and ingross the interests of the minority stockholders, states a cause of action for equitable relief, and for the appointment of a receiver as an incident to that relief. And the petition in this case, which is set out in full in the statement, is held to state a cause of action in those respects.

5. ————: ————: **Powers of Court of Equity.** The board of directors of a corporation are but trustees of an estate for all the stockholders, and may not only be amenable to the law, personally, for a breach of trust, but their corporation power under color of office to effectuate a contemplated wrong may be taken from them when, by fraud, conspiracy or covinous conduct, or extreme mismanagement, the rights of minority stockholders are put in imminent peril, and the original and underlying corporate intent is unfairly destroyed.

Appeal from Ste. Genevieve Circuit Court.—*Hon. Chas. A. Killian*, Judge.

AFFIRMED.

*Martin L. Clardy, W. M. Williams* and *H. J. Cantwell* for respondents on motion to dismiss appeal.

(1) The bill of exceptions as to all matters occurring in the St. Francois Circuit Court should and must have been filed in the St. Francois Circuit Court, or with the clerk thereof, and not with the clerk of the Iron Circuit Court. Keen v. Schnedler, 92 Mo. 525. (2) There is nothing before this court to review. The judgment is justified by the petition, and it may be doubted whether even the petition is properly made a part of the record which the appellants put before this court.

*Judson & Green, B. Greensfelder, M. W. Huff* and
*J. P. Cayce* for appellants in opposition to respondents' motion to dismiss.

The bill of exceptions could not have been filed in
St. Francois county and was properly filed in Iron
county. "The transfer of the cause by change of venue
took with it the whole cause, and every incident belonging thereto, to the Ralls Circuit Court, just as if the
cause had originated in that court. Not a shred or
patch of jurisdiction over the cause or any of its incidents was left in the Louisiana Court of Common
Pleas." Ex parte Haley, 99 Mo. 1. c. 152. This was in
the case of a receivership and the court said that the
receiver became an officer of the court to which the
case was transferred. Henderson v. Henderson, 55
Mo. 534; State v. Hopper, 71 Mo. 425; Cunningham v.
Current River Lumber Co., 165 Mo. 270; State ex rel.
v. Lay, 128 Mo. 609.

*Judson & Green, Bernard Greensfelder, M. W.
Huff* and *J. P. Cayce* for appellants on the merits.

(1) The order was irregular and void, in that no
bond was required of plaintiffs, although the order was
intended to operate and did operate as an injunction
upon defendants in the management of their property.
Appeal of Schlecht, 60 Pa. 172; Patten v. Accessory
Transit Co., 4 Abb. Pr. 235; Wolfe v. Claflin, 81 Ga. 64;
Fisher v. Superior Court, 110 Cal. 129; Brierfield v.
Iron Works Co., 54 Ala. 622. (2) The order was irregular and improper, in that there was no equity in
plaintiffs' petition, and that the differences between
the plaintiffs and the majority of the stockholders of
the company only related to the policy of the company
and to matters lawfully within the jurisdiction of the
board of directors. 2 Purdy's Beach on Corp., sec. 905;
Alderson on Receivers, sec. 349; Overton v. Railroad,

10 Fed. 866; 5 Pomeroy's Eq. Jur. (New Ed.), sec. 117; United Securities Co. v. La. Electric Co., 68 Fed. 673; Miller v. Kitchen, 103 N. W. (Neb.) 297; New Albany Waterworks v. Louisville Banking Co., 122 Fed. 776; Edison v. Edison United Phonograph Co., 52 N. J. Eq. 620; Wallace v. Pierce Wallace Pub. Co., 101 Ia. 329; Am. Loan & Trust Co. v. Toledo C. & L. Co., 37 Fed. 416; Flukes v. Railroad, 48 Kan. 576. (3) There was no emergency whatever within the meaning of the law, warranting the appointment of a receiver. Baker v. Backus, 32 Ill. 101; Nusbaum v. Stein, 12 Md. 315; West v. Swan, 3 Edw. Ch. (N. Y.) 420; Buchanan v. Camtock, 57 Barb. 568; Alderson on Receivers, sec. 7; Clark v. National Linseed Oil Co., 105 Fed. 787; Hancock v. American B. & T. Co.; 86 Ill. App. 630. The facts on this point are clear beyond dispute. The mine was not in operation for the reason that there was no money wherewith to operate. This had been its condition for a year previous. The bond issue had been under discussion for several months. The deed was recorded and some of the bonds delivered. No one knew these facts better than the plaintiff. (4) It appeared from the verified answer that all the allegations of mismanagement were denied. Williamson v. Monroe, 3 Cal. 383; Ins. Co. v. Grant, 3 MacArthur (D. C.) 220; Simmons v. Henderson, Freem. Ch. (Miss.) 493; 5 Pomeroy Eq. Jur. (New Ed.), secs. 66, 70; Alderson on Receivers, secs. 102, 114, 132-134; Sweeney v. Mayhew, 6 Idaho 455; Cranbie v. Order of Solan, 157 Pa. St. 588. (5) Plaintiff Cantwell himself was in no position to maintain this action against his associates in the corporate enterprise. His position is essentially unconscionable. Gas Co. v. Keiber, 5 Ill. App. 132; Harder v. Oil Co., 56 Fed. 57; Original Vienna Bakery v. Heissler, 50 Ill. App. 406; Ala. Coal & Coke Co. v. Shackelford, 157 Ala. 224; Thalmann v. Hoffman House, 58 N. Y. Supp. 227; Rothwell v. Robinson, 44

Nevins 538; Rumsey v. Detroit & McCattle Co., 116 Mich. 410; Ranger v. Cotton Compress Co., 52 Fed. 609; Smith on Receivership, sec. 226. (6) There was no illegality in the proposed bond issue; there is no provision of the Constitution or statutes violated, and under the law a corporation may issue its bonds at less than par. 3 Cook on Corporations, sec. 766; 3 Purdy's Beach on Corporations, 1157; Thompson on Private Corporations, 6056; Railroad v. Rust, 17 Fed. 273; Nelson v. Hubbard, 96 Ala. 238; Gamble v. Queens County W. Co., 123 N. Y. 99; Bank v. Railroad, 117 Cal. 332; Handley v. Stutz, 139 U. S. 428; Railroad v. Hanfield, 36 App. Div. (N. Y.) 605; Trust Company v. Irrigation Co., 79 Fed. 842; Farmers' Loan & Trust Co. v. Toledo & S. H. R. Co., 54 Fed. 772; Brown v. Railroad, 53 Fed. 889; Bank v. Mfg. Co., 96 N. C. 298. (7) It is immaterial whether the proposed bond issue was open to any legal objection or not, as there was no occasion for the appointment of a receiver. In any event, an injunction would have been an ample remedy, and the appointment of a receiver was an abuse of discretion. French v. Gifford, 30 Ia. 148; Brick Co. v. Robinson, 55 Md. 410; Railroad v. Duckworth, 2 Oh. Cir. Ct. 518; Etowah Mining Co. v. Wills Valley Min. & Mfg. Co., 106 Ala. 492; Alderson on Receivers, secs 7, 49; Schack v. Nickey, 97 Ill. App. 460; People's Inv. Co. v. Crawford, 45 S. W. (Tenn.) 738; Empire Hotel Co. v. Main, 98 Ga. 176; Waterbury v. Merchants' Union Em. Co., 50 Barb. 157; Laurel Springs Land Co. v. Fongeray, 50 N. J. Eq. 756; Denni v. Frankford, 205 Pa. St. 114; Freer v. Davis, 52 W. Va. 35. (8) It is fundamental that a receiver will not be appointed where it is the only relief asked. The appointment is ancillary, not the primary object of litigation. In this case no other relief was really sought. State ex rel. v. Ross, 122 Mo. 164; Supreme Sitting O. of I. H. v. Baker (Ind.), 20 L. R. A. 210; Whitney v. Bank (Miss.), 23 L. R. A. 531;

Philips v. Provident Steam Engine Co. (R. I.), 45 L. R. A. 560. (9) That a corporation is not as prosperous as expected is no ground for the appointment of a receiver. Am. Tribune N. C. Co. v. Schuler (Tex.), 79 S. W. 370; Manufacturers' Land & Imp. Co. v. Cleary (Ky.), 89 S. W. 248; Hedges v. Paquet, 3 Ore. 77.

*Martin L. Clardy, W. M. Williams, Moses Whybark, H. J. Cantwell* and *Stephen Cornelius* for respondents on the merits.

(1) There is no bill of exceptions properly in the record because none was filed in the proper court or within the proper time. There is no motion to revoke in the bill of exceptions. There is no abstract filed here and no such "record" as dispenses with abstract. Railroad v. Lewiston, 97 Ind. 488; Bank v. Stoddard, 169 Mo. 74. (2) The petition states a cause of action; plaintiffs are entitled to the relief asked, and the appointment of a temporary receiver was properly made. Tourer v. Ins. Co., 180 Mo. 153; Greeley v. Bank, 103 Mo. 212; secs. 753, 1338, 1339, R. S. 1899. (3) "Where it appears that a trustee is guilty of misconduct or waste, or an improper disposition of the trust estate, or that he has an undue bias towards one of two conflicting parties, or that the estate is liable to be wasted or destroyed, a proper case is made out for the appointment of a receiver." Meeker v. Winthrop Iron Co., 17 Fed. 48; Miner v. Belle Isle Ice Co., 93 Mich. 97; Ponder v. N. Y. & L. E. Co., 72 Hun 385. (4) "Where there are such disputes among the board of directors of a corporation as prevent the management of its affairs, a receiver may be appointed." 23 Am. and Eng. Ency. Law (2 Ed.), 1022. (5) The answer of defendants filed in vacation at the full hearing is no part of the pleadings but was taken at the hearing as an affidavit. It is of no greater effect than Loeb's own testimony and should be in the bill of exceptions if a bill

of exceptions were properly in this record. Unless this answer is in the bill of exceptions and unless the bill of exceptions is properly made part of the record, then the answer is not part of the record, even as an affidavit. The judge found against the defendants on the full hearing of all the evidence and the answer then filed cannot affect the issues in any way. (6) The petition asks for an accounting, the cancellation of the bonds, the appointment of a temporary receiver to preserve the property, a decree of dissolution of the corporation with a receiver to put the property in shape to properly liquidate its affairs. It is hard to discover where or how the appellants get authority for the statement that a receiver is the only object of this suit. (7) The proposed bond issue is in direct violation of the Constitution and statutes of Missouri. Sec. 8. article 12, Constitution; sec. 962, R. S. 1899. (8) While Cantwell's acquiescence as then president of the Columbia Lead Company, to the subscription of Langeloth being transferred to the American Metal Company, may estop him and the Columbia Lead Company from asserting that the American Metal Company is not entitled to the proceeds of such stock on dissolution of the company, yet the American Metal Company, a New York corporation, cannot under the laws of the State of Missouri exercise the powers of a stockholder in a Missouri corporation, and all of its acts and the acts of all of its agents in all the stockholders' meetings which its vote dominated and controlled and in all the meetings wherein its will alone was registered and enforced are *ultra vires* and void. Ollesheimer v. Mfg. Co., 44 Mo. App. 172; Bank v. Oliver, 62 Mo. App. 390; Hotel Co. v. Furniture Co., 73 Mo. App. 135. Section 1024, Revised Statutes 1899, provides that foreign corporations shall have no other or greater powers than corporations of like character organized under the general laws of this State. (9) Courts have repeatedly held

that they do have the power, acting through their receivers, to conduct a business to the end of liquidation without utter sacrifice in cases similar to this. Elk Fork Oil Co. v. Foster, 99 Fed. 495; Clarke v. Railroad, 54 Fed. 556; Thornton v. Highland Co., 94 Ala. 353; Smith v. Stage Co., 28 Hun 277; Dayton v. Wilkes, 17 Hun 510; Joplin Supply Co. v. Brennerman, 99 Mo. 657; R. S. 1899, secs. 753, 1338, 1339. (10) The judge had power to appoint, the defendants had notice, the defendants appeared, the plaintiffs made out a conclusive case justifying the exercise of both the statutory and equitable powers of the judge, and the judge did not abuse his discretion in appointing the receiver. The order should be affirmed on the merits.

LAMM, J.—Plaintiffs, as minority stockholders in the Columbia Lead Company, a domestic corporation, lodge their verified bill in equity in the St. Francois Circuit Court seeking a receivership for said corporation, as well as injunctive and other relief. Presently, Edward A. Rozier is appointed such receiver. Thereafter, defendants file a motion to revoke the appointment of Rozier. Thereafter, on hearing, oral testimony, affidavits and documentary proofs are introduced, covering, say, 500 pages of printed matter, with the result that the court refused to revoke its order. Thereupon defendants appeal.

The cause reaching this court, it was advanced and plaintiffs file their motion to dismiss the appeal, assigning for grounds, *inter alia,* that no bill of exceptions was filed in the St. Francois Circuit Court, which motion was taken with the cause on its merits.

It appearing after said proceedings in the St. Francois Circuit Court, and after an affidavit of appeal had been filed and appeal allowed, and after a supersedeas bond in the sum of $100,000 had been provided, and after time given to file a bill of exceptions, and

after an extension of that time — all in St. Francois
Circuit Court — that thereafter (and prior to the set-
tling and filing of the bill of exceptions), the cause
was removed. on its merits, on defendants' change of
venue to the circuit court of Iron county in another cir-
cuit — we say all these things appearing, it is insisted
by defendants that the bill of exceptions should have
been filed in the circuit court of Iron county (as it was)
and not in the circuit court of St. Francois county (as
plaintiffs insist). It is argued, furthermore, that the
bill of exceptions was filed in due time in the circuit
court of Iron county and, therefore, plaintiffs' position
is untenable. Defendants insist that if no bill of ex-
ceptions be here, yet the record proper is here, notwith-
standing, and consists of the bill in equity, the order
appointing a receiver, the motion to revoke and the
order made on that motion. That, in this view of the
case, we must look to the petition to see whether it
states a cause of action. And so looking, defendants
argue, it states no cause of action for the appointment
of a receiver, *ergo,* they say the order refusing to re-
voke the appointment should be reversed, regardless of
the evidence and the merits.

On the last hypothesis, the matter stands as if on
demurrer, and while the bill is very long, yet it can not
be condensed without danger of resulting ambiguity
and unfairness — the facts being many, the allegations
being minute and full, and the complaints being based
on complications, covering much time. The bill is,
therefore, presented, omitting caption and signatures,
as follows:

"Plaintiffs state:

" (1) That they are stockholders in the Columbia
Lead Company, a corporation organized and existing
under the laws of the State of Missouri under article
VIII, R. S. 1889, for the purpose of mining, milling
and smelting lead and other ores, and that this suit

is brought for themselves and for all other stockholders in said corporation who desire to join herein.

"(2) That plaintiff H. J. Cantwell is the holder of more than 8,500 shares of the par value of $10 each of the capital stock of said Columbia Lead Company, and has for more than four years been a holder of as many or more shares of said stock as now held. That plaintiff, D. A. P. Cooke, is the holder and owner of 500 shares of the capital stock of said corporation. That the plaintiff, R. D. O. Johnson, is the holder and owner of 267 shares of the capital stock of said corporation, or more. That the remaining plaintiffs are all holders of stock in said corporation.

"(3) That the Columbia Lead Company is incorporated under the laws of the State of Missouri as aforesaid, with a capital stock of $600,000, divided into 60,000 shares, of the par value of $10 each, and that all of said capital stock is fully paid up, and that said corporation has now and usually keeps an office and agent in Saint Francois county, Mo., for the transaction of their usual and customary business of mining.

"(4) That the Columbia Lead Company is the owner in fee simple of more than 1,000 acres of valuable lead lands in the Flat River Lead District in the county of St. Francois and State of Missouri; that said lands contain valuable deposits of lead ores, and that upon said lands are valuable improvements consisting of residences, offices, mills, shaft houses, mining machinery and railroads for the operation of a lead mine, and that the reasonable cash value of said lands and improvements is now at least in excess of $350,000, and probably in excess of $600,000, and that the mines hereinafter referred to are situated in said lands in St. Francois county, Missouri.

"(5) That a majority, to-wit, 32,144 shares, out of the total of 60,000 shares of the stock of said Columbia Lead Company, is owned and controlled by the

American Metal Co., Lt'd, a corporation organized under the laws of the State of New York, and now appears upon the books of said Columbia Lead Company in the name of the American Metal Co., Lt'd.

"That the Metallurgische Gesellschaft, a corporation or association organized or existing under the laws of the Empire of Germany, and having its principal office at Frankfort on the Main, the plaintiffs believe own and control over 2,000 shares additional formerly held in the name of the Metallurgische Gesellschaft, but now appearing on the books of the Columbia Lead Co., in the name of B. Hochschied, who is an officer of both the American Metal Co., Lt'd, and the Metallurgische Gesellschaft, and plaintiffs charge and believe that said B. Hochschied holds said stock as trustee for the Metallurgische Gesellschaft or the American Metal Co., Lt'd.

"(6) That said American Metal Co., Lt'd, and the Metallurgische Gesellschaft are practically the same company, being composed of practically the same stockholders.

"(7) That under the laws of the State of Missouri neither the said American Metal Co., Lt'd, nor the Metallurgische Gesellschaft is entitled to hold stock in a Missouri corporation.

"(8) That the said interests of the American Metal Co., Lt'd, and the Metallurgische Gesellschaft are hereinafter referred to as the 'majority' interest, and the plaintiffs and the other stockholders of said Columbia Lead Co., as the 'minority' interest.

"(9) That Jacob Langeloth of New York acquired about June 1, 1901, 35,001 shares of stock in said Columbia Lead Co., being 10,000 shares more than a majority, paying therefor $14 per share, and that he soon thereafter caused said stock to be transferred to the American Metal Co., Lt'd, and the Metallurgische Gesellschaft, and that since that date the American

Metal Co., Lt'd, has held more than a majority of the stock of the Columbia Lead Co., and has through its officers, agents and employees controlled the elections for the directors of the said Columbia Lead Co., has always since then had more than a majority of the directors constituted from its agents, clerks and employees, and has dictated and controlled the policy and management of the Columbia Lead Co., and completely dominated its affairs to the exclusion of the minority interest therein.

"(10)    That the board of directors of the Columbia Lead Co., consists of seven members; that the minority interest has now and has always had but two members of said board, to-wit, H. J. Cantwell and R. D. O. Johnson, who are still directors in said company, and who join with the plaintiffs herein. That the remaining directors of said company are now C. M. Loeb, B. Greensfelder, Sol. Roos, Max Schott and S. M. Rombauer.

"That C. M. Loeb is the president of the Columbia Lead Co., but is now absent from the State of Missouri, and is now domiciled in the State of New York and outside the jurisdiction of this court. That said Loeb holds but one share of stock in said Columbia Lead Co., and is now and has at all the times herein mentioned been an agent and employee of the American Metal Co., Lt'd, and that all of his acts while holding the said offices of president and director of the Columbia Lead Co., while owing a duty to all of the stockholders of the Columbia Lead Co., have been for the special benefit, interest and profit of the American Metal Co., Lt'd, the majority interest aforesaid, and not for the benefit of the Columbia Lead Co., or all of its stockholders.

"That Bernard Greensfelder, who is vice-president of the Columbia Lead Co., holds but one share of the capital stock of the said Columbia Lead Co., and the

plaintiffs believe is but the nominal holder thereof for the use and benefit of the American Metal Co., Lt'd; that said Greensfelder is acting as the attorney and agent of the American Metal Co., Lt'd, and that all of his acts at the times hereinafter mentioned, while owing a duty as an officer and director of the Columbia Lead Co., to all of the stockholders of said Columbia Lead Co., have been for the special benefit, interest and profit of the American Metal Co., Lt'd, and not for the Columbia Lead Co., or its stockholders.

"That Sol. Roos is the secretary and treasurer and a director of the Columbia Lead Co., and is the holder of but one share of stock of the Columbia Lead Co., and the plaintiffs believe holds said one share nominally only, said stock being held by him for the use and benefit of the American Metal Co., Lt'd. That said Roos is in the employ of said American Metal Co., Lt'd, and that all of his acts as an officer and director of the Columbia Lead Co., while owing a duty to all of the stockholders of the Columbia Lead Co., have been at the times herein mentioned and are now and will, by reason of his employment with said American Metal Co., Lt'd, continue to be, while holding said office, for the special benefit, interest and profit of the American Metal Co., Lt'd, and not for the benefit of the Columbia Lead Co., or all of its stockholders.

"That Max Schott, who is a director in the said Columbia Lead Co., is the holder of but one share of the capital stock of said Columbia Lead Co., and the plaintiffs believe holds said one share nominally only, said stock being held by him for the use and benefit of the American Metal Co., Lt'd.

"That said Schott is in the employ of the American Metal Co., Lt'd, and that all of his acts as a director of said Columbia Lead Co., while owing a duty to all of the stockholders of the Columbia Lead Co., have been at the times herein mentioned, are now and will by

reason of his employment with said American Metal Co., Lt'd, continue to be, while holding said office, for the special benefit, interest and profit of the American Metal Co., Lt'd, and not for the interest of the Columbia Lead Co., or all of its stockholders.

"That Sophie M. Rombauer, one of the directors aforesaid, is the holder of but one share of stock of the Columbia Lead Co., and the plaintiffs believe hold said one share nominally only, said stock being held by her for the use and benefit of the American Metal Co., Lt'd. That said Sophie M. Rombauer is a stenographer in the employ of said American Metal Co., Lt'd, and that all of her acts as a director of said Columbia Lead Co., while owing a duty to all of the stockholders of the Columbia Lead Co., have been at times herein mentioned, are now and by reason of her employment with said American Metal Co., Lt'd, will continue to be, while holding said office, for the special benefit, interest and profit of the American Metal Co., Lt'd, and not for the benefit of the Columbia Lead Co., or all of its stockholders.

"That since the purchase of the majority of said stock in the Columbia Lead Co., by the American Metal Co., Lt'd, the policy of the Columbia Lead Co., has been controlled absolutely and the management of the mine of said company conducted absolutely by the American Metal Co., Lt'd, through its control of the board of directors of the Columbia Lead Company.

"That a majority of said board has always since then consisted of the clerks, agents and employees of the American Metal Co., Lt'd, and that said majority of said board has always been 'dummies,' ready and willing to act as the will of the majority interest desired and without the majority of said board or any individual member of the majority of said board ever exercising any independent or individual judgment or discretion whatever.

"(11)    That at the time the said American Metal Co., Lt'd, acquired the control of the Columbia Lead Co., the said Columbia Lead Co. had besides its lands and improvements cash assets exceeding $150,000 and owed in liabilities of every nature less than the sum of $90,000, and then had more than $60,000 in cash assets available for improvements, above all of its liabilities. That the net market value of the property of said company at that time was $800,000.

"(12)    That said mine was then being successfully operated at a net profit per month over and above operating expenses of from $7,000 to $11,000.

"(13)    That while the labor cost of mining has since increased, yet with the surplus available for investment in the improvement of mechanical devices for said mine, the said mine should, by proper management, have been operated at a net annual profit of $50,000 to $60,000 ever since said time, except when interrupted by labor troubles.

"That said labor troubles are now settled and said mine can now be operated at a profit of $50,000 to $60,000 per year under proper management, as soon as the said mine can be restored to proper condition and put in shape for operation.

"(14)    That as soon as the American Metal Co., Lt'd, acquired control of said mine, it inaugurated at Mine No. 2, called the 'Pim' shaft, a system of mine development, which was notoriously opposed to all of the usual engineering practice of the district in this: That there is now and always has been at the Pim shaft and immediately adjacent thereto a large body of disseminated ore of the average grade of ore of the district. That said ore follows an irregular contour of its limestone matrix and can only be properly mined and developed by opening out wide areas and following the contour of the deposit after the contour is determined by diamond drilling from the surface and under-

ground, as is the usual, general, well-known and universally employed practice, method and system of the district, yet the majority interest, in defiance of the experience of the district, in willful abuse of the discretion reposed in them as directors, have persisted in a system of mine working at said No. 2 mine which is ruinous to said mine and which cannot be otherwise than to result in losses by operation in this, to-wit:

"That at said mine, under and by their orders, direction and control, and at an enormous expense, there have been run a series of *narrow* drifts to all points of the compass, the pretense being the development of a horizontal ore body, that the ore body is not horizontal, but is a body with irregular contours, dipping irregularly from two to six degrees from the horizon, that said narrow drifts being not more than 7 feet high and 8 to 10 feet wide, were run as of necessity they must be run if run at all. That said drifts were run without a sufficient quantity of drilling being done ahead, either at the surface or underground, to determine the objective levels of the ore bearing strata. That said drifts did not follow the ore strata; that the ore strata was left above and below each and all of said drifts and cannot be mined from said drifts except at an expense as great as if said drifts had never been run. That no proper or adequate drilling has been done at said mine to determine the levels of the ore bodies and the proper method of mining same. That all of said blunders in mining were made against the repeated but ineffective protests of the minority interest in the Columbia Lead Co., and were the wilful abuse of discretion of the majority interest and in violation of their duties herein and such an exhibition either of stupidity or wilful mismanagement as to show that the majority are incapable of discretion or have deliberately and wantonly planned the destruction of the property of the

minority interest expecting to recoup themselves for their share at a sacrifice price.

"(15)    That during the said period that the American Metal Co., Lt'd, has controlled the affairs of said Columbia Lead Co., they have operated the said mine at a loss exclusive of possible profits of one hundred thousand dollars due to the lack of discretion, incompetency or wilful fraud aforesaid.

"(16)    That on the .......... day of November, 1904, the majority interest herein ordered the mines of the Columbia Lead Co. shut down.

"(17)    That said American Metal Co., Lt'd, through its control of the board of directors of the Columbia Lead Co., persisted in its improper and fatally incompetent method of mine engineering and mine management until the cash surplus available for improvements as aforesaid was exhausted and the Columbia Lead Co. was still in debt to others about $20,000; and in March, 1903, C. M. Loeb, then president of the Columbia Lead Co., then as now and always the agent of the American Metal Co., Lt'd, reported to the board of directors that the Columbia Lead Co. was further involved in addition to the debts of $20,000 aforesaid, to the amount of $30,000, which he, the said Loeb, had borrowed from the American Metal Co., Lt'd, to continue operation at the mine. That the two directors representing the minority interest, to-wit, H. J. Cantwell and R. D. O. Johnson, then protested against said advances having been made without the consent of any of the minority interest and protested against any further loans being made by the said Loeb in that manner, but after the discussion at the meeting of the board of directors then being held, to-wit, on March 12, 1903, the said Cantwell offered a resolution approving the action of the said Loeb on condition that the minority interest be permitted to contribute their proportion of such advances.    The resolution thus offered

was defeated, as fully appears by the minutes of the board of directors, the said Cantwell and Johnson voting therefor and the remainder of the board of directors, then and always representing the interest of the American Metal Co., Lt'd, voting against.

"A resolution was then offered by a member of the board representing the American Metal Co., Lt'd, unqualifiedly approving the action of said Loeb, which resolution was passed by a majority of the board then and there acting and representing the interests of the American Metal Co., Lt'd, and the said Cantwell and Johnson then voting against same.

"(18)    That at the next meeting of the board of directors, held in April, 1903, the president, C. M. Loeb, was authorized by vote of a majority of the board of directors, which majority represented then, as always, and acting then, as always, in and for the interest of the Amercian Metal Co., Lt'd, to borrow $10,000 additional from the American Metal Co., Lt'd, the minority interest not acquiescing therein.

"(19)    That no feasible plan of mine operations was then presented to the board of directors of the minority directors or stockholders, and no plan of providing funds for repayment of such advances, nor was the minority asked or permitted to contribute thereto, and the plaintiffs believe and charge that said advances and the waste of moneys so advanced were made for the express object of putting the Columbia Lead Co. in debt and attempting to subject the property to sale under execution to the injury and in fraud of the rights of the minority stockholders.

"(20)    That the ruinous method of mine engineering was still being continued, and the minority interest, then realizing that the evident object of the majority interest was to so involve the Columbia Lead Co. in debt without any definite or reasonable plan of eventual extrication and that it then was the deliberate and

fraudulent plan of the majority interest to wipe out the minority interest in said corporation and mine, the plaintiffs, and particularly H. J. Cantwell, secured the organization of a corporation known as the Commercial Lead Co., which corporation proposed to and did lease the said Columbia Lead mine from the Columbia Lead Co., by and with the consent of all the interests in said Columbia Lead Co., at a fixed annual rental or royalty of $36,000 per year.

"(21)   That said Commercial Lead Co. actually paid in cash to the Columbia Lead Co., the sum of $45,-000 in royalties, but that owing to the violent labor troubles in the district, the losses thereby, the demoralized condition of labor immediately following and the inadequate capital of the Commercial Lead Co., to meet all all these losses and make necessary and further improvements and developments, the Commercial Lead Co. was unable to afford to continue to pay the fixed rental of $36,000 per year aforesaid, and the said Commercial Lead Co.. forfeited its lease and relinquished said mine to the Columbia Lead Co., about August 1st, 1904, and the American Metal Co., Lt'd, acting through its control of the board of directors of the Columbia Lead Co., again resumed control of the mine and affairs and property of the Columbia Lead Co.

"(22)   That the said Loeb then, to-wit, August 15, 1904, reported to the board of directors of the Columbia Lead Co. that the Columbia Lead Co. was still indebted to the American Metal Co., Lt'd, for advances, which advances were made without the acquiescence of the majority interest, in the sum of $25,500, and that the Columbia Lead Co. then still owed the sum of $7,-500 balances on lands purchased, and had available cash assets of not to exceed $5,000.

"That during the period of the lease of the property by the Commercial Lead Co. the Columbia Lead Co. should have had but little expense, but that dur-

ing the period there was a wasteful and unnecessary expenditure of more than $15,000, as shown by the meagre reports of the financial condition at the two periods, but plaintiffs have never been informed of the details of such expenditure and have no exact knowledge thereof.

"(23) That the majority interest, to-wit, the American Metal Co., Lt'd, acting by a majority of the directors of the Columbia Lead Co., elected by it, which directors were then and now and always the agents, servants and employees of the American Metal Co., Lt'd, then passed a resolution authorizing and requiring the said Loeb, as president of the Columbia Lead Co., to execute a note, due three months from date, to the American Metal Co., Lt'd, for $30,000, and to execute a mortgage or deed of trust to trustees for the American Metal Co., Lt'd, on all the property of the Columbia Lead Co.

"That the said resolution was passed by the majority of said board of directors against the protest of H. J. Cantwell and R. D. O. Johnson, the two members representing the minority interest. That the said majority of said board were then, now and always the agents, servants and employees of the American Metal Co., Lt'd, and were acting in the interest of the American Metal Co., Lt'd; that the said act of the board of directors was the act of the American Metal Co., Lt'd, and was in law and in fact a contract by the American Metal Co., Lt'd, with itself, by itself and for itself. That the said act of said majority of the board of directors was in fraud of the rights of the minority interest in the said Columbia Lead Co., and was intended to effectuate the purpose of the majority interest to extinguish and wipe out the minority interest in said property. That said mortgage was made to secure a pre-existing indebtedness of $25,000 made without authority, and the further advance of $4,500 was only

made to give the color of a present consideration for said mortgage.

"(24) That said mortgage or deed of trust, the plaintiffs were informed by the officers of the Columbia Lead Co., was duly executed but never recorded. Plaintiffs further state that the resolution and action as immediately before detailed was spread upon the records or the minutes of the board of directors of the Columbia Lead Co. That the said resolution and action were and are linked in the chain of conspiracies and frauds by which the interest of the majority of the board of directors hope to accomplish their purpose of extinguishing the property of the minority stockholders. That being convinced by the repeated protests of the minority that this particular action would not be permitted, the majority refrained from proceeding under said mortgage and have devised a more subtle scheme, as hereinafter detailed, to accomplish their fraudulent purpose.

"(25) That the defendants, acting as officers and directors of the Columbia Lead Co., but really the agents and attorneys of the American Metal Co., Lt'd, have caused the minutes of the board of directors to be changed and mutilated, and have inserted in said record as the proceedings of said board of directors, a pretended record of actions which in some instances did not in fact occur and in other cases did not occur at the time or in the manner as now stated in said minutes, in this, to-wit:

"That at the meeting of the directors, held December, 1903, the minutes recite that the salaries of the president and secretary were fixed for the ensuing year at $100 per month cash; that said minutes show the presence of Cantwell and Johnson at said directors' meeting and that Cantwell moved the adjournment of the meeting. Plaintiffs state that Cantwell did not move to adjourn said meeting, but that Cant-

well and Johnson did remain until adjournment and that no action whatever was taken by said board on the question of salaries. That the property was then under the lease to the Commercial Lead Co., and that the duties of president and secretary were merely nominal. That the falsification of said minutes was done for the express purpose of attempting to show the concurrence of the minority in an unnecessarily large expense.

"That at the meeting of the board of directors, held October 5, 1904, the majority interest offered a resolution calling a stockholders' meeting to vote upon a bond issue of $150,000. Said resolution, as offered, contained no clause specifying how the proceeds should be used or how the bonds should be sold, except that the directors might sell or hypothecate them. That Cantwell and Johnson protested against the resolution in that form, and that Cantwell then offered an amendment providing that the clause permitting the directors to sell and hypothecate said bonds be stricken out and the following words in lieu thereof be inserted after the word 'meeting,' to-wit, 'and to be sold at the best price obtainable, the proceeds of said sale to be applied first to the liquidation of the present indebtedness of the company and the balance to be expended for the preservation and the futher prospecting and development of the mining property of the company.'

"That Cantwell and Johnson voted for said amendment and the majority directors voted against said amendment, yet the minutes have been so written as to make it falsely appear that the above words, which really appeared in said amendment then so offered by said Cantwell, did appear in the original motion offered by the majority, and further it is falsely stated in said minutes that Cantwell's amendment proposed to strike out the said words. The minutes as thus distorted tend to show that the majority were favoring

that which they in fact opposed, and that Cantwell and Johnson opposed that which they, in fact, favored.

"That said change in the minutes is another link in the chain of conspiracies by which the majority, while cunningly devising a scheme to defraud the minority of their rights, seek to give a semblance of fair dealing to their actions.

"(26)   That mine No. 2 of the Columbia Lead Co. was, in November, 1904, shut down, and that both of the shafts on said property are now filled with water and said mines flooded and that the valuable deposit at No. 2 is thereby not open to the inspection of possible or probable purchasers of said property, and that the official records of said deposit are under the control of said majority.

"(27)   That while regular full monthly and daily reports of the operation of said mine have been made to the American Metal Co., Lt'd, in the city of New York, yet no detailed report of the operations has ever been made to the minority stockholders or the minority directors, no plans for the future have ever been disclosed to the minority directors or stockholders and nothing except a brief statement of alleged financial conditions has been mailed to the minority stockholders for three years.

"(28)   That at the time said mine was shut down the majority of the board claimed the Columbia Lead Co. was indebted to the American Metal Co., Lt'd, for advances alleged to have been made by the American Metal Co., Lt'd, to the amount of $30,000. That the minority stockholders were never asked to contribute to such advances and that they were never permitted by the majority to contribute to the alleged advances.

"(29)   That later, within the last six months, C. M. Loeb, president of the said Columbia Lead Co., made a contract for drilling of 20,000 vertical of diamond drilling, agreeing to pay therefor $1.10 per foot.

That no funds had been provided for this drilling. That said contract was not ordered by the board of directors and that neither of the minority representatives on the board of directors was made acquainted with said contract until long after it had been consummated.

"(30)    That plaintiffs further state that instead of locating the drill holes to be bored by the contractor for said drilling at the known ore body, to-wit, Pim shaft, in order to determine the extent and exact levels of the occurrences of ore at the said Pim shaft, where a shaft 500 feet is already sunk and which shaft is fully equipped for mine operation, the majority interest aforesaid, acting through the defendants, the majority of the board of directors of the Columbia Lead Co., are causing said drill holes to be sunk on new ground a great distance away from said ore body, and even should a new ore body be discovered, and plaintiffs say it is extremely improbable that a better ore body than the one already known and opened as the Pim ore body shall be discovered, the Columbia Lead Co. is without means to open up a new ore body, which would cost about $100,000.

"(31)    The plaintiffs say that the present prospecting by the diamond drill of unknown ground, instead of prospecting adjacent to the known ore body, is a direct, wilful fraud on the part of the majority interest under the circumstances and conditions of the Columbia Lead Co., and is done for the deliberate purpose of exhausting the resources of the company and engrossing the property of the minority stockholders to themselves.

"The plaintiffs say that no reports of the diamond drill prospecting are now made to the minority directors and none have ever been made to the stockholders, but that full, accurate and detailed reports of such drilling are made to the American Metal Co., Lt'd, at New York, and that the object of concealment of the drill-

ing operations is to make the information available to the American Metal Co., Lt'd, and to deny the minority interest any means of knowing of the value of their property and to deny them the opportunity of acquainting others with the value of the property, so that in the event of a foreclosure of the property, as is now fraudulently planned, as hereinafter detailed, the American Metal Co., Lt'd, may be the preferred bidder and may purchase the property at an inadequate price to the fraud and prejudice of the minority stockholders.

"(32)    Plaintiffs further state that on the 5th day of October, 1904, Loeb, Greensfelder, Schott and Roos, acting as directors of the Columbia Lead Co., and owing a duty as such to all stockholders, but really acting as the agents, employees and servants of the American Metal Co., Lt'd, at a special meeting of the directors, passed a resolution calling a stockholders" meeting for December 5, 1904, to submit a proposition to issue $150,000 bonds, and secure the same by a mortgage or deed of trust on all the property of said company.    The said call for a meeting for that purpose was passed by the .vote of Roos, Schott, Greensfelder and Loeb, the majority of said board, the minority directors, Cantwell and Johnson, protesting against the same in that form and manner and declaring that a definite plan for proper sale of securities should be formulated and for further operations.

"(33)    That thereafter, in pursuance of said resolution, at a stockholders' meeting on December 5, 1904, called in pursuance thereof, the following resolution was offered:

" 'Resolved that this company make and issue its first general mortgage bonds, payable to bearer or the registered holder thereof, for the aggregate amount of $150,000, which bonds shall bear date of January 1, 1905, and be of the denomination of $1,000 each, pay-

able in gold coin of the United States, and shall be numbered consecutively from 1 to 150 inclusive, and shall bear interest from 1st day of January, 1905, at rate of 6 per cent per annum, payable in like gold coin, semiannually, on the first day of January and July in each year as evidenced by coupons to be hereto attached, and

" 'Resolved, further, that for the purpose of securing the payment of said bonds and interest which shall accrue thereon, the company shall make, execute and deliver unto J. P. Cayce and Bernard Greensfelder, trustees, a mortgage deed of trust on all of its real estate and personal property wherever situated, in trust, for the benefit and security of the holders of such bonds, etc.:

" 'Resolved, that the president and secretary be, and they are hereby authorized and empowered for and on behalf of this company, to affix its corporate seal to each of said bonds, and when executed to deliver the same to the said trustees, etc.'

"At said meeting of the stockholders, said resolution was carried by the vote of the majority interest alone,. the minority not acquiescing therein and not voting.

" (34)    And at a special meeting of directors, held December 8, 1904 (of which notice of the purpose or object of the meeting was given to the minority directors, Cantwell and Johnson), there being present Rombauer, Schott, Roos and Greensfelder, and absent Loeb, Cantwell and Johnson, the following resolution was adopted:

" 'Whereas, the stockholders of the Columbia Lead Co., at a meeting held at the office of the company on Monday, December 5, 1904, authorized the issuance and sale of $150,000 of bonds, the payment of which is to be secured by the first general mortgage upon all of the property of the company;

" 'Therefore, be it resolved, that the president of the Columbia Lead Co. be and is hereby authorized to negotiate and use the entire issue of said bonds for the purpose of raising money for the benefit of the company, either by the sale of said bonds or from hypothecation or both, and to report back to the board of directors as to the best possible terms upon which he can use these securities.'

"Upon motion duly made, seconded and carried, the following resolution was adopted:

" 'Resolved, that in the pursuance of the consent and direction given by the stockholders of this company at their meeting duly called and held the 5th day of December, 1904, the board of directors hereby authorize and direct the issue of first general mortgage bonds of this company, to the amount of $150,000 par value, etc., and direct that the president or vice-president and secretary sign and execute said bonds and mortgages and affix the corporate seal thereto and to duly acknowledge said mortgage so as to entitle it to be recorded, etc., and to deliver the same to J. P. Cayce and B. Greensfelder, as trustees.'

"The said Greensfelder, designated as one of the trustees in said mortgage, is vice-president of the Columbia Lead Co.

"That said resolution was passed by the majority interest, to-wit, Rombauer, Schott, Roos and Greensfelder, the agents, servants and employees of the American Metal Co., Lt'd, and was not acquiesced in by the minority directors representing the plaintiffs and other holders of the minority stock.

"(35) That at a special meeting of the directors, held on April 10, 1905, C. M. Loeb, president of the company, reported that he had been unable to negotiate the bond issue of $150,000 upon any terms, and at that time the majority interest, acting through their agents, Schott, Greensfelder, Roos and Rombauer, de-

clared that they would have to sell the bonds at fifty cents on the dollar. That by reason of said discussion of selling for fifty cents on the dollar, the said Cantwell, representing the minority interest, offered the following resolution:

" 'Resolved, that the president be authorized to lease the property of the company for ten years on a basis of ten per cent royalty, with a minimum royalty in each year of $12,000, on condition that the lessees purchase $100,000 of the bonds of the company at sixty cents on the dollar, and that the proceeds of said bonds be used towards the payment of the present debts of the company and to meet the amounts which may become due under the contract with Tetley for drilling.

" 'In the event the sale of $100,000 bonds shall not realize sufficient to do this, that the proposed lessee purchase $110,000 of the bonds.

" 'Further be it resolved, that said lessee be given an option on the property of the company for one year subject to the issuance of $100,000 or $110,000 of bonds, at price of $300,000, lessee to assume outstanding bonds and pay $300,000—$100,000 cash on exercise of option and the balance one, two and three years at six per cent interest properly secured on the property.

" 'Be it further resolved, that as soon as it can be ascertained that such a contract can be entered into, that the stockholders be notified that they can within three days after such notice subscribe for, pay and receive their proportion of the bonds at said price, sixty cents on the dollar.

" 'And that the president be given until April 24th to ascertain if such a contract can be entered into.'

"Cantwell voting for said resolution and the remainder of the board—Johnson being absent—voting 'No.'

"It being then apparent to Cantwell that the ob-

ject was a foreclosure of the property, Cantwell offered the following resolution:

" 'Resolved, that the deed of trust proposed to be executed to secure the proposed issue of bonds shall contain a provision amplified in proper legal phrase to the effect that in the event of default in the payment of the bonds and consequent foreclosure the property shall be sold at public sale on the following terms:

" 'In the event the bid shall exceed the amount with interest of the then outstanding bonds, the bidder shall be required to pay in cash only the amount of the outstanding bonds and interest and shall be permitted to execute notes for the remainder of his bid secured by deed of trust on the property in five equal annual payments for five years with interest from date of purchase at six per cent, payable annually.'

"Cantwell voting 'Yes,' and the remainder 'No.'

"*Cantwell then insisted* that the stockholders should at least have an opportunity to buy the bonds, and thereupon a resolution was offered by the majority calling a stockholders' meeting for April 24th, at which time the stockholders might vote upon a proposition then formulated by the majority interest for each stockholder to buy his pro rata of the bonds, to which call for a stockholders' meeting for that proposition Cantwell unwillingly acquiesced.

"(36) The following call was then sent out by the president and secretary of the Columbia Lead Co.:

" 'A special meeting of the stockholders of the Columbia Lead Co. is hereby called for Monday, April 24th, at which time and place a proposition will be submitted, asking the stockholders to authorize the board of directors and officers to sell the issue of $150,-000 bonds upon the basis of $500 for each $1,000 bond.

" 'If the above proposition should carry, the stockholders of the Columbia Lead Co. would be entitled to

subscribe to said issue of bonds according to their respective holdings.'

"(36a) On April 24th at a meeting of the stockholders, held in accordance with said notice, the following resolution was offered by the majority interest:

" 'Resolved by the stockholders of the Columbia Lead Co., in meeting this day assembled, that the action of the board of directors and officers of this company in all matters pertaining to the issue and sale of bonds aforesaid be ratified and approved, and that the board of directors and officers of this company be and are hereby authorized to offer for sale to the stockholders of this company the entire issue of bonds aforesaid at a basis of fifty cents on the dollar of the face value of said bonds according to and in proportion to their respective holdings of the capital stock of said company, and that if any of the said stockholders fail or refuse to purchase their pro rata share of the bonds so ordered to be issued and sold on the basis above set forth, that the board of directors be and they are hereby authorized to sell the remaining bonds to other persons on the same basis; and that the president and secretary notify the stockholders of this opportunity to purchase the bonds of the company as aforesaid by mailing a notice to this effect and permitting him up to the 9th day of May to subscribe to his proportionate share of said bonds, and that the board of directors be authorized to change denominations, etc.'

"(37) That at said stockholders' meeting the American Metal Co., Lt'd, cast 32,144 votes in favor of said resolution, B. Hochschied 2,150 votes in favor of said proposition, B. Greensfelder one vote in favor of said proposition, and Sol Roos one vote in favor of said proposition, aggregating 34,296 votes in favor of said proposition, being the vote of the majority interest aforesaid, and there were 1,855 votes of the remaining minority interest cast against said resolution, the re-

maining minority stockholders, recognizing the futility of protest, failed to vote thereon, but did not in any way acquiesce in said action.

"(38)  Thereafter at a special meeting of the directors, held on the 26th day of April, 1905, at which there were present Rombauer, Roos, Schott and Greensfelder, being the majority of said board and being the representative of the American Metal Co., Lt'd, as aforesaid, and absent Cantwell and Johnson, the representatives of the minority aforesaid, said special meeting being held without any notice of the object thereof, the following resolution was passed by the majority interest aforesaid:

" 'Resolved, that the president and secretary communicate with each of the stockholders by mailing them a letter giving them until May 9, 1905, to accept of their proportionate share of the bonds at the rate of fifty cents on the dollar of the face value thereof, payment to be made on or before July 1, 1905.'  Which resolution was carried.

"(39)  At another special meeting of the directors, held on May, 10, 1905, at which there were present a majority of directors, and absent Cantwell and Johnson, the minority directors, said notice being given without any notice of the object of said meeting, it was reported that $99,200 bonds had been subscribed to be sold and delivered on July 1, 1905, at 50c on the dollar; of the $99,200 subscribed, $85,400 were subscribed by the American Metal Co., Lt'd, and $5,400 by B. Hochschied.

"That at said meeting the majority stockholders, to-wit, Roos, Schott, Rombauer and Greensfelder, by resolution, also authorized the sale to the American Metal Co., Lt'd, of the remaining bonds, to-wit, $50,800 to the American Metal Co., Lt'd, at fifty cents on the dollar, payment to be made and delivery of said bonds to be had on July 1, 1905.

"(40)    Plaintiffs state that in all said acts, said majority directors were acting not for the Columbia Lead Co., but by, with and for the American Metal Co., Lt'd, and that said acts were in fact and in law a contract with the American Metal Co., Lt'd, with itself, and for itself, in fraud of the rights of the minority stockholders of the Columbia Lead Co.

"(41)    That at the meeting of the directors of ————, C. M. Loeb, president of the company, reported that he had gone to 'all the trust companies in St. Louis, and that none of them would have the bonds.'

"Plaintiffs say that in fact, while it was the duty of the said Loeb to present the matter of loan or purchase of bonds in a fair and proper light, his inquiry at the trust companies was made, not for the purpose of inducing the trust companies to loan the necessary money on the property or to induce the trust companies to buy the bonds, but was done in the manner and for the express purpose of inducing said trust companies to decline such a loan or purchase of bonds.

"(42).    Plaintiffs state that the property of the Columbia Lead Co. is of such value that any man of business experience should by the exercise of proper diligence and address and by taking the holders of money to the property, secure the straight loan of at least $75,000 for 5 years at no greater rate than 8 per cent per annum and a commission of not to exceed 5 per cent.

"That the minority interest have the right to ask and demand that the further operations necessary should be met by the loan by the company on the property without the payment of the outrageous bonus of 100 per cent proposed.

"That the stockholders, comprising the minority interest, are under no duty to individually contribute at their peril upon refusal of the loss of their stock interest in said company.

"(43)   That the inevitable effect of said sale of the bonds of $150,000 for $75,000 and the continuance of the methods of the majority interest will be a foreclosure under the deed of trust for default of the interest and the wiping out of the interest of the minority stockholders and the absorption of the property by the American Metal Co., Lt'd, to the injury and prejudice of the minority interests and in fraud of their rights as stockholders in said company.

"(44)   That while the property of the Columbia Lead Co. can readily be sold by any man of business capacity, provided the No. 2 mine were opened for inspection and put in shape therefor, and provided the drill records were made public, for a sum sufficient to pay all debts and expenses and give a surplus to distribute to stockholders of from $5 to $8 per share, yet it cannot be sold advantageously unless the No. 2 mine is pumped out, the drilling now under contract be required to be done adjacent to said ore body and faces of ore in the mine exposed for inspection to possible purchasers and these necessary and evident acts which it is the duty of the majority interest to perform are steadily and persistently refused by said majority to be done, to the injury and prejudice of the minority interest herein and in fraud of their rights as stockholders.

"Plaintiffs further state that the issuance of the bonds and execution of the deed of trust, as proposed, would work irreparable injury to the plaintiffs and would accomplish and effectuate the fraud contemplated if said bonds should get into the hands of innocent holders for value.

"(45)   That the American Metal Co., Lt'd, only employs $5,000 in the conduct of the business in this State, as shown by its reports; that the defendant directors are wholly unable to respond in adequate

damages to the plaintiffs, and that the plaintiffs have no adequate relief except in equity.

" (46) That if the issue of said bonds be enjoined, there are a number of valid claims, including part of the advances made by the American Metal Co., Lt'd, which the Columbia Lead Co. is legally responsible for, although the minority interest has received no benefits therefrom, and although said obligations were incurred to the prejudice of the plaintiffs and in fraud of their rights, and that in order to conserve and preserve said property and to properly and equitably protect the interest of all concerned, including not only the plaintiffs- and other minority stockholders' interests, but the majority interests as well, it is necessary that a receiver be appointed, with full power to borrow on long time, on the security of the properties, an adequate sum to pay off all such obligations, to conserve and protect . the property, to pay for the drilling already contracted, and to put the property in shape for an advantageous sale.

"Plaintiffs further state that the drilling now being conducted on the property, considering the present circumstances and conditions of the Columbia Lead Co., is an injudicious and improper waste of money, and that said drilling should be done where the results thereof can be utilized in the operation of the mine already opened, to-wit, No. 2 mine. That the continuance of such drilling at points as now conducted and not at the proper place, works an irreparable injury to the plaintiffs.

"Plaintiffs further state that there are many thousands of dollars of valuable machinery on the property which is not put in proper shape to preserve from rust, and with the exception of the drilling no work is being conducted at said mine, and the valuable machinery is permitted to be exposed to the waste of the elements.

"Plaintiffs state that they fear and have reason to fear that the American Metal Co., Lt'd, through a majority of the directors of the Columbia Lead Co., acting therewith and therefor, will attempt, if unrestrained, a foreclosure for the $36,000 mortgage heretofore referred to or may attempt to bring suit of the Columbia Lead Co., if unrestrained by this court.

"(47)   Plaintiffs further say that by reason of the purchase by a foreign corporation of the large holdings aforesaid, constituting a majority of said stock and by the great interest of the minority holders, it is extremely unlikely and improbable that any harmonious action between the stockholders for the conduct of said company can ever be arrived at, that the majority interest has violated all duties which the majority owe to the minority, and that the plaintiffs have reason, from the action of the majority in the past, to expect a continuance of such violation of their rights and to believe that if unrestrained by this court, the violation of the rights of the minority by the majority will continue.

"Wherefore, plaintiffs pray:

"1st.   That a temporary injunction be issued restraining the defendants and the managing officers of the Columbia Lead Co., from executing the deed of trust proposed, from delivering any bonds thereunder, from placing upon the records either of said deeds of trust aforesaid; that the persons named as defendants and all officers of the Columbia Lead Co., be restrained from performing any further acts as officers or directors of the Columbia Lead Co., and from exercising any control over the property of said company whatever, and that said injunction be made permanent upon final hearing.

"2nd.   That the offices of directors and officers of the Columbia Lead Co. held by the defendants be declared vacant.

"3rd.  That the American Metal Co., Lt'd, be temporarily restrained and enjoined from enforcing or claiming any rights whatever under the obligations alledged to have been created by the Columbia Lead Co., to them for the $30,000 note and mortgage heretofore referred to and for the obligations unlawfully created to deliver bonds as aforesaid and for any further existing obligations claimed to be due the American Metal Co., Lt'd, from the Columbia Lead Co., until a full accounting can be had as hereinafter prayed, and further order of this court, and that said injunction be made permanent.

"4th.  That the evidence of obligations aforesaid to the American Metal Co., Lt'd, and the liens created or attempted to be created therefor be cancelled and held for naught.

"5th.  That a receiver be appointed to preserve and conserve said property and that said receiver be ordered to immediately take charge of the property in St. Francois county, Missouri, and of the books and papers of said company, and of all property, books, papers and effects of the said Columbia Lead Co., within the State of Missouri.

"6th.  That said receiver be directed to continue the drilling on said property already contracted for, and the said receiver be authorized to negotiate a loan at long time upon the security of the property of the company for a sum sufficient to pay off existing encumbrances, all valid debts due to the American Metal Co., Lt'd, and others, a sum sufficient to pay for the drilling contracted for by defendant, and for such further drilling underground, that may be necessary, and for an amount necessary to properly put said No. 2 mine in mine shape, for inspection and sale and to operate the same if advantageous, and a sum necessary to pay the interest charges for at least two years.

"7th.  That an accounting be had of all sums due

to and from the Columbia Lead Co., between the American Metal Co., Lt'd, and said Columbia Lead Co., and the receiver be ordered to ascertain the total indebtedness of the said Columbia Lead Co., to all persons and report same.

"8th. That a decree of dissolution of said Columbia Lead Co. be entered and that the receiver be empowered, after putting the said property in shape to be sold, to receive the bids of probable purchasers of said property, and that said property be sold, subject to the loan which he may negotiate, for the best price obtainable, and that the net proceeds, after the payment of all debts, be distributed among the stockholders, and for such further equitable and proper relief as the circumstances require."

Defendants answered at length and with detail, denying certain averments in the petition and pleading other matters, not only taking the sting out of the charges made, but making an affirmative showing, somewhat by way of confession and avoidance on certain allegations, and which answer was verified by affidavit. This answer was filed before the hearing on the motion to revoke the appointment of Rozier as receiver, but, as its probative force at that stage could be no more and no less than an affidavit on the merits, it need not be set forth, unless the merits are reached by us.

Preliminary questions are thus seen to be injected into the case and demand answer before the merits are got at; for if we hold there is no bill of exceptions here, then, by that token, the merits are not here.

(a) Are the evidence, the exceptions and rulings below on the hearing, preserved in a bill of exceptions and before us on this appeal?

(b) If there be no bill of exceptions here, is the motion to revoke before us as part of the record proper?

(c) If there be no bill of exceptions and no mo-

tion to revoke the order appointing a receiver before us, then, assuming the allegations of the petition to be true, as on demurrer we must, does the petition state a cause of action and had the court jurisdiction to appoint a receiver thereon?

Of these in their order.

I. The petition was filed in the circuit court of St. Francois county on the 23rd of June, 1905. Rozier was appointed receiver on the 24th of June, after notice — all parties appearing by person or attorney. On the 12th of July, 1905, defendants filed a motion to revoke the order appointing Rozier, and on the same day filed their answer. On the 18th of July, the motion to revoke was taken up and heard, and, on the 20th of that month, overruled; and on that day defendants appealed, being allowed until August 1, 1905, to file their bill of exceptions. One extension of time was granted in the St. Francois Circuit Court — in that court, Judge Killian presiding. On the 5th of September, a change of venue was taken on the merits and the cause sent to the circuit court of Iron county — in that court, Judge Williams presiding. In the Iron Circuit Court, the time for settling and filing the bill was extended by stipulation and the bill, as settled and signed by Judge Killian, was filed in the Iron Circuit Court within the prescribed time, to-wit, on October 13, 1905.

In the Supreme Court of Indiana, the precise point was considered and held against the contention of appellants here, i. e., that the bill was properly filed in the court to which the case was sent. [Railroad v. Leviston, 97 Ind. 488.] In that case it was ruled that: "A bill of exceptions filed in a court to which the venue is changed will not save an exception taken in the court from which the venue is changed, though the same judge preside in both courts."

In effect, similar questions have been before this court time and again and the same result reached. It

could not be contended that Judge Williams should
have settled and signed a bill of exceptions upon mat-
ters occurring before Judge Killian in another circuit,
— and this, because of the inherent nature of a bill
of exceptions and the personal knowledge and duties in
settling and signing such bill, singular to the judge who
presided when the exception was taken — a condition
somewhat obviated (in certain contingencies) by
remedial legislation. [State *ex rel.* v. Gibson, 187 Mo.
l. c. 553, *et seq.*]

Keen v. Schnedler, 92 Mo. 516, was a suit institu-
ted in the St. Charles Circuit Court, a change of venue
was awarded to the Warren Circuit Court, an excep-
tion being taken in the Warren Circuit Court to the
ruling of the St. Charles Circuit Court, it was insisted
the St. Charles Circuit Court erred. BLACK, J., speak-
ing for this court (p. 525), said: ''The exception, to be
of any avail to the defendants, should not only have
been taken at the time the order was made, but it should
have been preserved by a bill of exceptions filed in
the St. Charles Circuit Court and at the term thereof
when the order was made'' — and of course filed there
if leave to file was extended beyond the term.

This ruling was not a new one. It was announced
as early as 1857, in Potter v. Adams, 24 Mo. 159, and
has been steadily applied. [State *ex rel.* v. McKee, 150
Mo. l. c. 238; Cunningham v. Railroad, 165 Mo. l. c.
278, *et seq.;* State v. Nave, 185 Mo. l. c. 135; Eudalcy v.
Railroad, 186 Mo. 399; Guy v. Railroad, 197 Mo. 174;
Bowring v. Railroad, 90 Mo. App. l. c. 327.]

It is true (in a sense) when a change of venue is
taken, it takes the whole cause away, and the court in
which the cause becomes pending has jurisdiction the
same as if it originated in that court, and that it may
be said (by way of metaphor), as has been said, that
''not a shred or patch of jurisdiction over the cause or
any of its incidents'' is left in the court that lost juris-

diction by the change of venue. [*Ex parte* Haley, 99 Mo. l. c. 152; State *ex rel.* v. Lay, 128 Mo. l. c. 616, and cases cited.]    But this cannot mean that, when an appeal has been perfected to this court on an interlocutory order or judgment, the right to take all the medium or necessary steps for perfecting that appeal does not remain in the court granting the appeal, though afterwards the principal cause is sent away on a change of venue to some other court.    The filing of the bill of exceptions in the case at bar was a mere incident to the granting of the appeal, but a necessary incident, and is included in the power to grant the appeal. To close the incident and make the judgment roll and record rounded out and complete on the appointment of the receiver and the appeal from the order refusing to revoke, the bill of exceptions should have been filed in the St. Francois Circuit Court, and shown by entry of record, if filed in term time (Roush v. Cunningham, 163 Mo. l. c. 178); but, if filed in vacation, the filing might have been proved by the indorsement thereon of the filing of such bill by the clerk of that court. [Carter v. Prior, 78 Mo. 222.]

This would appear consistent with the common sense of the thing; and is so, although, where exception is taken on some intermediate ruling not directly appealable at the time, or on some interlocutory order from which no appeal lies, and which exception is saved by a term bill in the court where taken, and afterwards the cause goes on a change of venue to some other court to be thereafter appealed, such term bill of exceptions must be embodied in the main bill in order to present the matter here for review. No practical obstacle lies in the road of effectuating such procedure, because if the term bill is filed before the change of venue it goes with the transcript to the other court — if filed after such transcript is forwarded, it must still be incorpo-

rated in the principal bill of exceptions by bringing it to the attention of the court settling the final bill.

In this case, the appeal came here from St. Francois Circuit Court. The transcript of judgment came from the clerk of that court, and if the bill of exceptions had been filed there he could (and should) have made a complete transcript, if that course had been adopted on appeal. As, however, the cause was brought up by short form and there is no complete transcript (which seems the better course), and since we have been furnished evidence the bill of exceptions was never filed in the St. Francois Circuit Court and is, therefore, not authenticated, it is not here for our consideration — the matter being left precisely as if appellants had perfected their bill, had it allowed and signed, and then concluded to abandon it by not filing it.

II. It follows from the ruling just made, that the motion to revoke the appointment of the receiver is not here; because that motion is not a part of the record proper. It could only become a part of the record by being incorporated in a bill of exceptions and then by making the bill with all its contents a part of the record by filing it in the proper court.

Certain peculiar motions, having the force and effect of original proceedings, are part of the record proper, City of Tarkio v. Clark, 186 Mo. l. c. 293, but a motion to revoke an order appointing a receiver is not one of that class. And in order to entitle the mover to have the order reviewed in the appellate court, the motion should have been preserved in a bill of exceptions. [Bank v. Bank, 169 Mo. 74.]

III. The execution of the mortgage, under the singular scheme disclosed in the petition, being pending and imminent, it is a question not needing decision whether (in the face of irreparable damage) notice of the application for the appointment of a receiver was-

necessary. [State *ex rel.* v. Dearing, 184 Mo. l. c. 660, *et seq.*] But be that one way or the other, we find notice was given. Hence, the order appointing Rozier receiver cannot be held void for failure to give notice.

This leaves nothing for decision except the single question: Does the petition state a cause of action for equitable relief, and, as incident to that relief, the appointment of a receiver? Its consideration may proceed on the assumption that the petition must state facts sufficient to warrant the appointment of a receiver, or the order appointing one cannot stand. [Pullis v. Pullis, 157 Mo. 565.]

The evidence not being here and the question for decision being one of law, it would be manifestly improper, we think, to preclude or foreclose questions of fact not now before us. Assuming the allegations of the petition to be true, it discloses a scheme on the part of the majority of the directors of the Columbia Lead Co., some of them mere nominal stockholders, to wreck the corporate property in the interest of a wrongful combination of a majority of the stockholders with a majority of such board of directors. Courts have hesitated to lift the affairs and assets of a corporation out of the hands of its board of directors and administer them through receivers, and have flatly said so, and given cogent reasons for this hesitancy. [Thompson v. Greeley, 107 Mo. l. c. 586, *et seq.*; State *ex rel.* Attorney-General v. People's United States Bank, 197 Mo. 574.] But when all this has been said, it may further be said that this court has never denied power in a chancellor to prevent a scheme of irreparable injury and wrong, merely because the movers in that scheme speak and act in a corporate capacity rather than in an individual capacity. That solvent corporations are wrecked for purely selfish and illegal purposes, that minority interests are "frozen out," that business immorality has run amuck under the assumption that

courts are powerless, is too true. But the assumption is wrong. Judicial hesitancy does not mean judicial atrophy or paralysis. The board of directors of a corporation are but trustees of an estate for all the stockholders and may not only be amenable to the law, personally, for a breach of trust, but their corporate power under color of office to effectuate a contemplated wrong may be taken from them when, by fraud, conspiracy or covinous conduct, or extreme mismanagement, the rights of minority stockholders are put in imminent peril and the underlying, original, corporate *entente cordiale* is unfairly destroyed. It would be a sad commentary on the law if, when the trustee of a corporate estate is making an improper disposition of it, or has shown improper partiality towards one of its conflicting parties, or has put the estate in a fix it is liable and likely to be either wasted or destroyed, or mercilessly taken from all and given to a part, a court could not reach out its arm and preserve and administer the estate. We have never so declared the law. [Greeley v. Bank, 103 Mo. 212; R. S. 1899, sec. 753; *Ibid,* secs. 1338, 1339; Gluck & Becker on Receivers of Corporations, sec. 9, p. 53; Smith on Receiverships, sec. 225; Allison on Receivers, secs. 346-357; and see, generally, the cases cited in State *ex rel.* Attorney-General v. People's United States Bank, *supra.*]

The bill in this case states a cause of action and the court had jurisdiction to appoint a receiver, in our opinion. Therefore, the judgment and order, *nisi,* refusing to revoke the appointment of one is, accordingly, affirmed.

All concur.