No. 32,675

G. L. JORDAN, *Appellee*, v. THE AUSTIN SECURITIES COMPANY, O. D. COLLIS et al. as the Board of Directors of Said Company, and E. C. KIESWETTER, as Executor of the Last Will and Testament of Robert B. Austin, Deceased, *Appellants*.

(51 P. 2d 38)

Opinion filed November 9, 1935.

*Thomas F. Doran, Clayton E. Kline, Harry W. Colmery, M. F. Cosgrove* and *Balfour S. Jeffrey,* all of Topeka, for the appellants.

*John S. Dean, John S. Dean, Jr., Mark Bennett, E. R. Sloan, W. Glenn Hamilton, F. A. Sloan* and *Eldon R. Sloan,* all of Topeka, for the appellee.

*Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson, Ralph W. Oman, J. Glenn Logan* and *Frank E. Miller,* all of Topeka, as *amici curiae.*

The opinion of the court was delivered by

WEDELL, J.: This appeal deals with the appointment of a receiver.

The plaintiff, a minority stockholder in the defendant, the Austin Securities Company, a corporation, brought this suit. He obtained the appointment of a receiver for the defendant company and an injunction against that company. The defendants have lodged their appeal here to reverse that judgment. The appointment of a receiver is the main issue.

Frequent references will be made to the defendant, the Austin Securities Company, and to the W. A. L. Thompson Hardware Company, a corporation. For brevity we will designate the former as the "securities company," and the latter as the "hardware company." The trial court made findings of fact and conclusions of law which appear later in this opinion. Space will not permit narrating all those facts here. There is not much complaint with the findings of fact, and that limited complaint will receive attention later. A few important facts will be sketched, however, in order to clarify the main broad issue.

The defendant securities company is a creditor of the hardware company. The hardware company and none of its other creditors are parties to this suit. The claim of the securities company against the hardware company in the sum of $227,688, is its only asset of substantial value. The hardware company and the securities company had a common board of directors. The ownership of stock in them is not the same. The main conflict in the light of the unchallenged findings of fact arises in connection with tentative preference contracts between the hardware company and its other creditors, alleged preferred payments made to other creditors by the hardware company and in connection with a certain written agreement between the hardware company and the securities company known as the repurchase agreement.

Plaintiff, in the commencement of his suit, obtained an order restraining: *first,* the directors of the securities company from joining in the proposed preference contracts, which would subordinate its claim of $227,688 against the hardware company to the claims of other creditors of the hardware company; *second,* from surrendering any of the collateral held by the securities company as security for its claim; *third,* from otherwise dissipating or disposing of any of the assets of the securities company.

After the restraining order was served on the defendant directors of the securities company, the hardware company made payments to its other creditors. No questions are raised here concerning any

defect or insufficiency of the pleadings, but in order that the contentions of the parties may be more clearly understood a summary of the pleadings will be made.

The material allegations of the amended petition, in substance, were:

That the plaintiff is the owner of 138 shares of the preferred stock of the defendant securities company of the value of $100 per share, and the owner of 240 shares of the common stock, and that the hardware company is indebted to the securities company in excess of $200,000, the indebtedness being secured by collateral, and that the hardware company is indebted to other creditors and is unable to pay its debts in the regular course of business, and is in imminent danger of insolvency; that the securities company is about to surrender to the hardware company without compensation the collateral held to secure the indebtedness due the securities company and that the hardware company is threatening to and is about to enter into a contract with its various creditors by the terms of which contract all of the other creditors of the hardware company are to be preferred, and under the terms of which contract the indebtedness to the securities company is to be deferred until all of the other creditors of the hardware company are paid in full.

That the financial interests of the hardware company and securities company are adverse and that the board of directors of the securities company occupy the inconsistent position of attempting to represent both the hardware company and the securities company, and that by reason of their superior interest in the hardware company they are unfitted and incompetent to properly represent the interests of the shareholders of the securities company; that the proposed contract would seriously affect the solvency of the securities company and would constitute a surrender without compensation or value of securities now held by the securities company in trust for the use and benefit of its shareholders.

That unless the securities company is restrained from entering into the proposed contracts and from voluntarily surrendering the collateral it now holds as security for the indebtedness owing by the hardware company, such contracts will be entered into and the collateral surrendered without compensation and the solvency of the securities company destroyed, to the irreparable loss of plaintiff and other shareholders of the securities company.

That the defendants, the board of directors of the securities com-

pany, since they are at the same time directors of the hardware company, occupy inconsistent and irreconcilable positions and are incompetent in law and in fact to exercise the duties and responsibilities and to perform the trust imposed by law upon them as directors and managers of the affairs of the securities company.

That plaintiff was induced to purchase his preferred shares of stock in the securities company on the representations made by the managing officers and directors of the securities company.

That the purpose for issuing and selling the preferred stock was to raise money to carry the sales contracts of the hardware company and that the proceeds from such sale would be used for that purpose, and that the banks had theretofore carried such sales contracts for the hardware company and had during the previous year realized a profit thereon of approximately $30,000; that plaintiff relied upon these representations, but that a major portion, if not all, of the proceeds from the sale of preferred stock have been invested in direct loans to the hardware company although the hardware company had at the time exhausted its credit with the bank, and that the securities company and its officers and directors knew at the time they made such loans that the hardware company was in an embarrassed financial condition; that because of their financial interest in the hardware company and being directors and officers of that company at the time, without due regard to the interests of the securities company and its stockholders, and in violation of their promises and representations, they loaned the money direct to the hardware company without taking collateral security therefor, and that this was done in disregard of their duty to the securities company.

Paragraph 12 of the amended petition alleges "that the defendants (naming the directors of the Austin Securities Company, and Robert B. Austin, now deceased), before and at the time of the organization of the securities company were the owners of 1,258 shares of the common stock of the hardware company and were then the officers and directors of the hardware company and constituted a majority of the board of directors and of the officers of that company and that upon the organization of the securities company they became officers and directors thereof and constituted a majority of the board of directors and of the managing officers of that company *de facto*."

In this paragraph plaintiff further alleges that these individuals

as officers of the hardware company and *de facto* officers of the securities company entered into pretended transfers of common stock between themselves and the securities company and between the two companies for the purpose of controlling the management of the hardware company through the securities company and that said attempted sales or exchanges of stock were fraudulent and void *ab initio* and beyond the power of the securities company to consummate.

Paragraph 13 of the amended petition states that plaintiff is without adequate remedy at law and prays that the defendants be temporarily restrained from entering into the proposed contracts and from surrendering the collateral held by the securities company as security for the debt of the hardware company or from otherwise dissipating or disposing of any of the assets of the securities company and that permanent injunction be granted.

Plaintiff then prays that the alleged transfer of the common stock of the securities company to the individuals named be declared null and void, and that the individuals be required to deliver back to the securities company all the common stock issued to them in pursuance of the fraudulent transaction described in paragraph 12 of the amended petition, and that the securities company be authorized and required to return to such individuals or their representatives the common stock of the hardware company.

Plaintiff further prays for a decree declaring that the individual defendants are not the duly elected and qualified directors and officers of the defendant securities company, but are merely *de facto* directors and officers, and that under court order a stockholders' meeting be called to reorganize the defendant securities company by the legal election of a board of directors, and that if deemed necessary by the court a receiver be appointed to take charge of the affairs of the defendant securities company so as to conserve and protect its assets for the benefit of its shareholders, and then prays for such other relief as may be just and equitable.

To the foregoing amended petition defendants filed their single answer, the substance of which is:

Defendants admit certain formal allegations in plaintiff's petition contained, which allegations are not at issue in this appeal. They then allege that the defendant directors are the duly qualified and acting directors of the defendant securities company.

In answer to paragraph 12 of the amended petition, the defend-

ants describe what they understand to have been the procedure in the transfer of stock referred to in paragraph 12 of plaintiff's amended petition; defendants further state that all the matters and things related therein were fully known to the plaintiff at the time he purchased his stock, and that the purchase and sale of the common stock constituted a legal and valid transaction; that the defendant securities company is a legally incorporated corporation and that the things alleged in paragraph 12 of plaintiff's amended petition cannot be raised by plaintiff in this action, but can be raised only by the state of Kansas in a direct proceeding against the defendant securities company.

They further allege that:

". . . the particular indebtedness from the W. A. L. Thompson Hardware Company to the Austin Securities Company is an indebtedness owed the said company, and that plaintiff herein has no right, title or interest in or to said indebtedness. That the said plaintiff has no claim of any kind against this defendant corporation, or the individuals comprising the board of directors, but that he is simply a stockholder in said corporation; that the present directors of said corporation have no interests inconsistent with or in conflict with the interests of the plaintiff in this action, and conduct said corporation in an honest, businesslike manner, and in such manner as their business judgment decrees the affairs of said corporation should be conducted. That a court of equity should permit said corporation to continue to do business under the management of its board of directors, and under the law, and should not interfere unless active fraud is proven on the part of said board of directors. That if it is deemed by the board of directors of said defendant corporation to be to the best interests of said corporation and its stockholders, and to the stockholders of its subsidiary, the W. A. L. Thompson Hardware Company, to subordinate the debt of the W. A. L. Thompson Hardware Company to the Austin Securities Company until such time as the general trade creditors and bank creditors of said corporation are paid, said defendant board of directors, in the exercise of their sound business judgment, proposes to subordinate said debt, and if at such time it should be deemed necessary, they will subordinate same, on such terms and conditions as they deem advisable.

"That said W. A. L. Thompson Hardware Company, as a going concern, is not insolvent, and under proper management defendant board of directors feels that all indebtedness from said company to its general trade creditors, and to the Austin Securities Company, will be paid in full, but that in order to secure said payment, arrangements will necessarily have to be made with trade creditors and banks to defer the payment of indebtedness owed by said the W. A. L. Thompson Hardware Company, in order to prevent a loss of approximately $500,000 to the preferred stockholders of the W. A. L. Thompson Hardware Company and to the Austin Securities Company, most of which stock is owned within the city of Topeka.

"That if the management of the present board of directors is taken away by this court, it is the judgment of defendants that the business of the W. A. L. Thompson Hardware Company cannot continue to·exist, and liquidation will inevitably result."

After the conclusion of the trial, the trial court made certain findings of fact and conclusions of law, which are as follows:

"1. The plaintiff, G. L. Jordan, owns·two hundred and forty shares of the common stock, and one hundred and twenty shares of the preferred stock of the defendant, the Austin Securities Company.

"2. The W. A. L. Thompson Hardware Company is a corporation organized and existing under the laws of the state of Kansas, and for many years has been engaged in the wholesale hardware business at Topeka. The business for which it was organized is stated in its original charter to be: 'To buy and sell hardware·in. all its branches.'

"On the 24th day of December, 1919, the following amendment to the charter of said hardware company was adopted:

" 'That the purposes for which this corporation is formed, are to buy and sell hardware and automotive supplies and accessories, and to purchase, hold, sell, transfer, mortgage, pledge or otherwise dispose of the shares of capital stock of, or bond, securities or evidences of indebtedness created by any other corporation, or corporations of any state, or of the United States, or any other country, nation or government, which corporation shall be incorporated for the accomplishment of the same or similar purposes as the corporation incorporated hereunder or shall be incorporated for purposes, the accomplishment of which would be incidental to or would aid or facilitate the accomplishments of the purposes for which the corporation created hereunder was incorporated.'

"3. On the 25th day of June, 1930, the following-named persons were owners of a majority of the shares of the common stock of the W. A. L. Thompson Hardware Company, to wit: R. B. Austin, O. D. Collis, F. C. Kaths, E. C. Kieswetter, O. J. Kieswetter, R. LaBunker, Mrs. E. W. Swan, and owning approximately 1,250 out of 2,000 shares of the common stock of that company.

"These men also constituted a majority of the board of directors, as well as holders of a majority of the common stock of the said hardware company, and were the executive and managing officers thereof.

"On said day the said R. B. Austin, E. C. Kieswetter, Reginald LaBunker, J. W. Bauerline and O. D. Collis filed an application with the charter board of the state of Kansas, signed by each of them, requesting that a charter be issued for a corporation to be known as the Austin Securities Company, which said application was granted, and the charter issued. Said charter stated the alleged purposes of said corporation to be as follows:

" 'To invest and loan money on real estate, chattel, or other personal security; and to organize and maintain a brokerage and commission business with authority to buy, sell and deal in stocks or commodities dealt in upon boards of trade and exchanges, and to acquire, own, sell, and/or otherwise dispose of, and deal in stocks, bonds, mortgages, securities and notes and

commercial paper of corporations and individuals and to act as agent for others in the buying and selling of stocks, bonds and securities on commissions with powers to hold. and improve real estate and to transact any and all business connected therewith and to do any and all things necessary in the conduct of said business.'

"No subscriptions for the stock of the proposed corporation were evei made or filed, nor was the affidavit required by section 17-214, R. S. of Kansas, 1923, ever filed with the charter board.

"4. The board of directors named for the first year in said application and charter were the said R. B. Austin, E. C. Kieswetter, Reginald LaBunker, J. H. Bauerline and O. D. Collis.

"5. The said Robert B. Austin prepared, or had prepared, elaborate minutes purporting to be the minutes of a meeting of the board of directors of the Austin Securities Company held June 25, 1930, and requested one John Bauerline to sign the same as secretary of the corporation. The said purported minutes of said meeting were recorded in a book which has been introduced in evidence in this case. Said minutes purport to recite the transactions of the board of directors named in said application and charter and include a set of by-laws of the Austin Securities Company.

"No regular stated or formal meeting of the board of directors of the Austin Securities Company was ever held at which any resolution was passed, or action taken, providing for the sale of the common stock of said securities company, or fixing a price at which the same should be sold.

"6. The incorporation of the Austin Securities Company was with an authorized capital stock of fifty thousand shares of common stock without nominal or par value and five thousand shares of preferred stock without nominal or par value.

"7. Under the direction of said Robert B. Austin and in June or July of 1930, thirty-six thousand shares of common stock of the said securities company were issued as follows:

| | | | |
|---|---|---|---|
| R. B. Austin | 19,350 | R. LaBunker | 270 |
| O. D. Collis | 12,270 | F. C. Kaths | 1,050 |
| E. C. Kieswetter | 2,070 | O. J. Kieswetter | 540 |
| Mrs. E. W. Swan | 450 | | |

"No money was paid to the securities company by the persons named for the certificates of said common stock issued and the securities company received in exchange for these thirty-six thousand shares of its common stock twelve hundred shares of the common stock of the W. A. L. Thompson Hardware Company which were owned by the persons named in this finding.

"8. The balance sheet of the W. A. L. Thompson Hardware Company of January 1, 1930 (Plaintiff's Exhibit C), showed common stock surplus and undivided profits to be worth $450,807.89 or $225 per share for said common stock.

"9. At and before the organization of the Austin Securities Company, the W. A L. Thompson Hardware Company has been a profitable business. On January 1, 1930, the assets of the company were $1,029,550.69 and its liabilities, not including common-stock liabilities, were $254,742.80. During the last six months of 1929 and the first six months of the year 1930 the

company had enjoyed the largest volume of business and profits in its history. During the last half of the year 1930 the volume of its business declined approximately forty percent and continued to decrease until 1933 when the volume of business was sixty-eight percent less than in 1929, with some increase since 1933. The business of the company has been conducted at a loss since the middle of 1930 on account of the decrease in volume of business due to the business depression which began in the fall of 1929 and which still continues. No dividends have been paid upon the common stock of the W. A. L. Thompson Hardware Company since the transfer of the said twelve hundred shares of said common stock to the Austin Securities Company.

"10. The following shares of the common stock of the said the Austin Securities Company were sold to the public for cash at the rate of $8 for each share of said common stock as follows:

| | | | |
|---|---|---|---|
| Alex Brislen | 1 | R. N. Jordan | 8 |
| John Brislen | 1 | George Cross | 20 |
| Henry C. Corbutt | 10 | Bernice McGregor | 10 |
| Grace Crawford | 2 | Willa Rogers | 138 |
| Mary Dale | 1 | Mrs. Birdie Smalley | 2 |
| Mrs. Mary Doran | 5 | Mrs. Chas. Brooks Thomas | 12 |
| Beulah Hill | 2 | Winifred Welcome | 40 |
| Ethel L. Jordan | 20 | | |
| G. L. Jordan | 240 | Total | 520 |
| Leslie Jordan | 8 | | |

"The shares purchased by these persons were not issued by the Austin Securities Company out of the treasury stock, but were a part of the stock theretofore issued to the said Robert B. Austin, and the money realized from said purchasers was paid to said Robert B. Austin and his said certificate of shares was reduced in number corresponding to the shares thus transferred.

"New certificates were issued to such purchasers in regular form and the transfer in regular form recorded on the books of the Austin Securities Company, and said Robert B. Austin paid to the securities company $719.16, designating the same as profit.

"11. On July 1, 1930, the W. A. L. Thompson Hardware Company was indebted to various banks in the sum of $563,000 and was indebted to trade creditors in the sum of $254,742. At the end of 1930 the hardware company owed to banks $200,000, but during this period owned assets which were probably worth three times as much as its liabilities.

"12. Immediately after its charter was granted the Austin Securities Company prepared to issue three thousand shares of preferred stock and proceeded at once through banks and investment companies to sell the same. These shares of preferred stock were sold at $100 per share, and in 1930 the Austin Securities Company received from the sale of its preferred stock the sum of $169,350, and in 1931 received from the sale of its preferred stock $10,900, and in 1932 there was sold to the W. A. L. Thompson Hardware Company the remainder of the issue of preferred stock for $69,750, for which the W. A. L. Thompson Hardware Company gave to the Austin Securities Company its check.

"13. The Austin Securities Company never came into possession of any money except from the sale of its preferred stock except in the amount of

about $716.16, which was paid to it by Robert B. Austin and which he described as profit on the sale of a portion of his common stock of the Austin Securities Company.

"14. Of the moneys coming into the treasury of the Austin Securities Company only about $10,000 was expended in purchasing sales contracts of the W. A. L. Thompson Hardware Company which was· so invested in about the first month after its incorporation.

"15. The Austin Securities Company from the time of its incorporation June 25, 1930, until the end of 1930 advanced to the W. A. L. Thompson Hardware Company $149,500, a part of which ($127,000) is covered by the repurchase agreement of January 30, 1932, and the remainder of which ($22,500) is included in a note of April 12, 1934.

"In 1932 the Austin Securities Company advanced to the hardware company $74,171, $46,071 of which is included in a note of January 31, 1934, $56,464.38 of which is included in a note dated April 12, 1934, and $13,035.68 which is included in the repurchase agreement of January 30, 1932.

"In 1933 the Austin Securities Company advanced to the hardware company $620, and in 1934, $395.63 which are included in the note of January 31, 1934.

"16. The office of the Austin Securities Company was in the office of the W. A. L. Thompson Hardware Company. Up to his death on the —— day of —— 1935, Robert B. Austin was the dominating figure and controlling person in both companies and the other directors of both companies followed the directions of said Robert B. Austin and in the directors' meetings ratified all he had done. None of the money loaned or advanced to the hardware company by the securities company was ever repaid. Interest on the same was paid up to and during the year 1934 from which interest the Austin Securities Company paid its quarterly dividends on its preferred stock, the last of said dividends being paid in February, 1935.

"17. On January 30, 1932, an instrument, designated as a 'repurchase agreement,' was executed, the same being plaintiff's exhibit 6, which is made a part of these findings by reference. That transaction was directed by Robert B. Austin and is not mentioned in any of the minutes of the meetings of the board of directors of the securities company.

"18. The collateral security held by the Austin Securities Company for the payment of said indebtedness has no present market value, except the stock of the National Bank of Topeka, and said collateral security is of doubtful value and wholly inadequate to secure the payment of the money due the said the Austin Securities Company.

"The Austin Securities Company never had an investment or financial committee, but all of its financial transactions were conducted by the said Robert B. Austin.

"19. The W. A. L. Thompson Hardware Company is indebted to the Austin Securities Company in the sum of $227,688 as of April 30, 1935.

"20. The securities company holds securities covering advances and which are included in the 'repurchase agreement' as follows:

> 500 shares of nonpar common stock of the Spic & Span Stores Corporation, Topeka, Kan.

100 shares of nonpar common stock of the Curry Hardware Company, Clay Center, Kan.

100 shares of nonpar common stock of the Lindsay Hardware Company, Ottawa, Kan.

100 shares of nonpar common stock of Manhattan Hardware Company, Manhattan, Kan.

100 shares of nonpar common stock Marysville Hardware Company, Marysville, Kan.

100 shares of nonpar common stock Muenzenmayer Hardware Company, Junction City, Kan.

100 shares of the nonpar common stock of the Peterson Hardware Company, McPherson, Kan.

500 shares of the nonpar common stock of the Austin Investment Company, Topeka, Kan.

"For the note dated January 31, 1934, the securities company holds as collateral security a deed to farm in Lyon county, Kansas, subject to a mortgage of $2,800 and carried on the balance sheet of the W. A. L. Thompson Hardware Company at $6,995.10. For the note dated April 12, 1934, the securities company holds as collateral security ten shares Topeka Hotel Company, ten shares Kansan Hotel Company, fifteen shares National Bank of Topeka, two hundred and seventy-three shares of the Bowen-Nuss-Brown Hardware Company, note of the Spic & Span Stores Corporation for $18,963.92 and seven hundred sixty and a half shares preferred stock of the Austin Securities Company.

"21. From and after the time of the organization of the Austin Securities Company, all of the officers purporting to act on behalf of said company, and all of the officers of the W. A. L. Thompson Hardware Company, have been the same identical persons with the exception of two members of the board of directors of the hardware company. A majority of the board of directors of both corporations were the same identical persons, and the said Robert B. Austin was president of both.

"22. After the death of Robert B. Austin, on ——— 1935, the W. A. L. Thompson Hardware Company, of which he was president and financial and business manager, was unable to pay its trade creditors and bank creditors the various amounts due them as the same became due. An audit of the financial condition of said company was made by a firm of accredited C. P. A. accountants, and a financial statement issued, which audit is marked 'Defendant's Exhibit 1.' Also an audit of the Austin Securities Company is marked 'Plaintiff's Exhibit 10,' which exhibits are made a part of this finding by reference. Various meetings between the officers of said hardware company and its creditors were held at Chicago, Kansas City, St. Louis and Topeka, with a view to making some arrangements for extensions of time for the payment of debts owing by the said hardware company.

"As a result of said meetings a tentative agreement was reached, which was reduced to writing, which is plaintiff's exhibit 3 and made a part of these findings.

"At such meetings of creditors the said O. D. Collis represented the views and voiced the sentiments of a majority of the board of directors of the said hardware company.

"23. On the 8th day of June, 1935, this suit was commenced, and on the same day a temporary restraining order was issued, which is made a part of these findings by reference.

"24. After the commencement of this suit, and the service of said temporary restraining order upon each of the individual defendants, the said hardware company paid in cash all creditors of that company whose accounts amounted to $100 or over, twenty-five percent of their indebtedness, but did not pay any part on the debt owing by the hardware company to the Austin Securities Company; and the said payments to each creditor, as aforesaid, were accompanied by two letters, plaintiff's exhibit 24 and defendant's exhibit 2, and made a part of these findings. Said payments were made upon agreement of the creditors thus paid that they would take no action upon their claims until December 1, 1935. Provided, however, that no amount of principal or interest should be paid by the hardware company to the Austin Securities Company.

"25. That as of April 30, 1935, the quick assets of the W. A. L. Thompson Hardware Company amounted to the sum of $502,461.10; that the current liabilities of said company, including an amount of $227,688.00 of notes and other contractual indebtedness to the Austin Securities Company, amounted to the sum of $569,737.29.

"26. That other assets of the W. A. L. Thompson Hardware Company as of April 30, 1935, which were of questionable value, amounted to $281,008.50.

"27. That the Austin Securities Company claims notes payable due it by the W. A. L. Thompson Hardware Company of $84,651.58, contractual indebtedness of $140,035.68, and accrued interest of $3,000.74, making a total of $227,688.00.

"28. That the W. A. L. Thompson Hardware Company owed notes payable to banks of $120,000; notes payable to trade creditors of $17,500; notes payable for equipment purchased $1,847.36; trade accounts payable $172,305.51; personal and sundry accounts payable $3,097.37; accrued expenses $23,049.87; rent $4,249.18.

"29. That the hardware business of the W. A. L. Thompson Hardware Company requires a large amount of working capital; that by reason of the condition of the company, it is unable to obtain further credit from banks or trade creditors, until its existing obligations are materially reduced.

"30. That the trade creditors and the bank have indicated that they are willing to defer seventy-five percent of their indebtedness, provided the indebtedness claimed by the Austin Securities Company is deferred until bank and trade creditors are fully paid, or are paid to such an extent that out of profits the claim of the Austin Securities Company can be paid.

"31. Trade creditors and banks have stated to the company that if any payment is made to the Austin Securities Company, said banks and trade creditors will insist upon liquidation of the company.

"32. The bank and trade creditors of the W. A. L. Thompson Hardware Company claim that they extended credit to said hardware company on the strength of financial statements made by Robert B. Austin who was president both of said hardware company and the Austin Securities Company, and which statements did not show the indebtedness of the W. A. L. Thompson

Hardware Company to the Austin Securities Company, and these creditors claim that the Austin Securities Company, being the majority stockholder in the W. A. L. Thompson Hardware Company, said banks and trade creditors are entitled to a preference over the Austin Securities Company's indebtedness.

"33. That the present directors and officers of the Austin Securities Company own the majority of the common stock of the Austin Securities Company, and in turn control, through stock owned by the Austin Securities Company, the W. A. L. Thompson Hardware Company.

"34. That for all practical purposes the officers and directors of the two companies are identical.

"35. That the officers and directors and the majority common stockholders of the Austin Securities Company have declared their intention, if necessary in order to permit the business of the W. A. L. Thompson Hardware Company to continue, to subordinate the claim of the Austin Securities Company to the claims of the bank and trade creditors; that under the evidence produced said officers and directors believe such action to be to the best interests of all parties concerned.

"36. It is the intention of the defendants, and each of them, to permit the bank and trade creditors of the hardware company to obtain a preference over the Austin Securities Company by reason of the payments made, as stated in finding No. 24, and it is the intention of the said defendants, and each of them, to subordinate the creditor claims of the Austin Securities Company to those of the bank and general trade creditors of the W. A. L. Thompson Hardware Company.

"37. That no fraud has been shown on the part of any defendant to this action; that in their management of the affairs of the Austin Securities Company and in subordinating the claim of that company against the W. A. L. Thompson Hardware Company to those of the bank and trade creditors of the hardware company, and in consenting to preferences being obtained by such other creditors, the defendant directors of the Austin Securities Company are influenced by their interest in the W. A. L. Thompson Hardware Company and a desire to keep that company from bankruptcy, and also from a belief that if the hardware company can be saved from bankruptcy and be allowed to continue its business, that at some future time and after the bank and trade creditors are paid in full or other arrangements made by them, that the hardware company will be in a position to pay the claim of the Austin Securities Company against it.

"38. That the Austin Securities Company is a solvent corporation, and owes no debts. That less than twenty-five percent of the outstanding preferred stock of the Austin Securities Company is represented by the plaintiffs in this action.

"39. That the plaintiff in this action is the owner of common stock in the corporation; that at the time he purchased the stock he was fully advised that the company owned the control of the majority of the stock of the W. A. L. Thompson Hardware Company; that he acquired said common stock shortly after the incorporation of the company; that he has never attended a stockholders' meeting, and has never made any inquiry or investigation as to the affairs of the corporation.

"40. The business and charter purposes of the Austin Securities Company is to loan its capital and its only source of profit is the interest earned from such loans. Practically all of its capital is now invested in the loans to the W. A. L. Thompson Hardware Company mentioned in these findings and no interest is being paid on these loans and the hardware company will pay no interest on these loans as long as the banks and trade creditors of said hardware company insist that the indebtedness of the hardware company to the Austin Securities Company be subordinated to their claims. On account of this situation the Austin Securities Company cannot carry out its purpose of loaning its capital in a way that it would earn money for the benefit of its stockholders.

"41. The plaintiff purchased both his common and preferred stock in the Austin Securities Company by paying cash for the same at the rate of $100 per share for preferred stock, and $8 per share for common stock. He made his purchases upon representations made to him both by the president of the Austin Securities Company, Robert B. Austin, and by the selling agents employed by said securities company, that the purpose and object of the corporation in issuing the preferred stock was to invest in installment payments or trade contracts, and that such business would be profitable, as shown by the profits made by banks who had purchased such paper from the W. A. L. Thompson Hardware Company during the previous year, and carried the same at a profit of upwards of $30,000. The plaintiff was also furnished at the time of such purchase with a pamphlet reciting the purposes for which the money derived from the sale of stock was to be used, a copy of which pamphlet is plaintiff's exhibit 1, and made a part of these findings.

"42. The directors of the Austin Securities Company have not held a meeting since the death of Robert B. Austin, and have failed and neglected as a board of directors to consider the claim of the Austin Securities Company against the hardware company or the legal rights of the securities company under the so-called repurchase agreement or the legal rights of the securities company against the hardware company growing out of the indebtedness existing between said companies or to the claim of the other creditors of the hardware company that their indebtedness is superior to the indebtedness due the securities company."

### Conclusions of Law

"1. The exchange of the 36,000 shares of the common stock of the Austin Securities Company for the 1,200 shares of the common stock of the W. A. L. Thompson Hardware Company is not void and is not voidable at the suit of a common stockholder of the Austin Securities Company who purchased his common stock after such exchange of stock.

"2. The defendants, O. D. Collis, F. C. Kaths, E. C. Kieswetter and Reginald LaBunker, are the legal directors of the Austin Securities Company.

"3. Under the charter of the Austin Securities Company it was legal for that corporation to loan money to the W. A. L. Thompson Hardware Company and such loans having been made and having not been repaid, the Austin Securities Company is a legal creditor of the W. A. L. Thompson Hardware Company.

"4. It was the duty of the directors of the Austin Securities Company. in their management of the affairs of that corporation to preserve the assets of the corporation for the benefit of the corporation and its stockholders, and the only asset of any substantial value being the claim of the corporation against the W. A. L. Thompson Hardware Company, which company is without bank or any credit, and which has been and is now operating at a loss, and its financial affairs being dictated by a class of creditors to their benefit by obtaining preferences over the claims of the Austin Securities Company, to take action to preserve the assets of the corporation by collecting the indebtedness owing to it by the W. A. L. Thompson Hardware Company, and in such a situation it is a violation of their duty to the Austin Securities Company amounting to mismanagement to enter into any agreement to subordinate the claims of the corporation to those of the other creditors and to stand by and permit preferences to be obtained by the other creditors of the hardware company.

"5. The temporary injunctions should be made permanent.

"6. A receiver should be appointed to take charge of the affairs of the Austin Securities Company for the purpose of preserving its assets and protecting the interests of its stockholders.

"The court further finds that H. H. Motter is a proper and suitable person to act as receiver for the Austin Securities Company and that his bond should be fixed in the sum of $1,000 until the further order of the court.

"It is therefore considered, ordered, adjudged and decreed that a receiver be and is hereby appointed for the Austin Securities Company, and H. H. Motter be and he is hereby appointed receiver of the Austin Securities Company and his official bond fixed at $1,000 to be approved by the court.

"It is further considered, ordered and adjudged that said receiver be and he is hereby clothed and vested with all the powers and authority of receivers in similar cases and is authorized, empowered and directed to maintain, operate, manage, conduct, continue and carry on the business of said the Austin Securities Company and to do all things necessary, appropriate and incidental to such operation, carrying on, continuance and conduct of said business; to make such purchases of supplies, equipment and material and to enter into such contracts and incur such liabilities as are incidental, proper or necessary to fully and completely carry out this order and any subsequent order of this court; to collect and receive the income, rents, revenues, issues and profits of said property and assets of said corporation and all accounts, debts and claims to which said corporation is lawfully entitled; to reduce to and take possession of all said assets and property; to enjoy and exercise any and all rights and privileges of said corporation as a creditor of any person, firm or other corporation; to institute and prosecute, as well as to defend, all suits brought by or against him or said corporation and to appear and defend in his own name, or otherwise, all suits now pending or hereafter brought by or against said corporation or him; and to intervene in or become a party to such suits, actions, proceedings at law or in equity in state or federal courts, as may in his judgment be necessary or proper for the protection, maintenance and preservation of said property and assets and in carrying out the terms of this or any subsequent order of this court; to execute

in his own name or in the name of said corporation all necessary appeal, supersedeas, injunction or other bonds which may be required by law in carrying out this order or any order of this court; to compromise, adjust and settle suits, actions and claims which are now pending or may hereafter be presented, prosecuted or brought by or against said corporation or said receiver as may be by him deemed necessary or proper and upon the compromise and settlement of any such claims to execute and deliver any necessary receipt, release or remission to the obligor thereof, including the release and discharge of any claim, mortgage, lien or other preferment to real or personal property and to pay such necessary expenses as may be incident to any and all of the matters herein set forth.

"The defendant, the Austin Securities Company, its officers, directors, agents and employees and all other persons claiming to act by, through or under said defendant, the Austin Securities Company, are hereby enjoined from interfering in any way whatsoever with the possession of the whole or any part of the properties of said the Austin Securities Company or interfering in any way with said receiver to prevent the discharge of his duties.

"That said receiver shall continue in possession of said property and assets and continue to operate, manage, conduct and carry on the business of said corporation until the further order of this court and said receiver may from time to time apply to this court for such further orders and directions as he may deem proper, necessary or requisite in the due administration of his trust."

Appellants' contentions may be summarized under three main headings:

1. The trial court committed error in finding that the hardware company is now operating at a loss.

2. The other findings of fact do not support the conclusions of law and require judgment for defendants.

3. The appointment of a receiver amounts to abuse of judicial discretion.

The facts in this lawsuit are clearly set forth in the findings of fact, and it is deemed unnecessary to repeat them here. Reference will be made to specific findings at appropriate places in the course of the opinion. Appellants' exceptions to findings of fact challenge only one fact found by the trial court. That fact is contained within conclusion of law number 4. It is the finding of fact first mentioned above in connection with appellants' contentions of error. It is:

1. "The trial court erred in finding that the hardware company is *now* operating at a loss."

This court deems it unnecessary to examine the entire record, including the detailed audits, to determine the exact accuracy of that finding. The financial condition of the hardware company clearly appears in the unchallenged findings of fact. The hardware

company on April 30, 1935, had quick assets amounting to $502,-461.10; its current liabilities were $569,737.29. This total amount of the liabilities included the sum of $227,688 which the hardware company owed to the securities company. Other assets of the hardware company on the same date which were of questionable value amounted to $281,008.50. (Findings of fact 25 and 26.) The witness, Newman, testified:

"Q. Now, if the banks and commercial creditors and the Austin Securities Company were treated equally you could give as much time as you wanted to and leave as much money as was necessary with the hardware company in order that they might demonstrate their ability to make money, couldn't you? A. They could do that. It wouldn't do any good.

"Q. It wouldn't do any good? A. No.

"Why not? A. Because I don't think the hardware company can make $500,000 in the next three or four years.

"Q. You think that if all the creditors are treated equally the hardware company is insolvent? A. No question about it."

The fact that the hardware company is heavily in debt is not in dispute. That the hardware company is without bank or trade credit until it reduces its present indebtedness is admitted. (Finding of fact 29.) Whether its immediate present operation leaves it slightly in the black or red column is not an important factor in this appeal. It is not the hardware company for which a receiver was appointed, but the securities company. For the purpose of this appeal we may well rely upon the undisputed facts concerning the financial condition of the hardware company without determining to a mathematical certainty whether there was any evidence that the hardware company is now operating at a loss.

Appellants challenge for the first time in this court a portion of finding of fact number 9. The portion challenged is this:

"The business of the company (hardware company) has been conducted at a loss since the middle of 1930."

From a careful examination of the record we find nothing to indicate that the correctness of this portion of finding of fact number 9 was challenged before the trial court. On the contrary the record indicates that it was not. Appellants' exceptions to findings of fact and conclusions of law as heretofore stated challenged only the one fact which we have heretofore discussed. Appellants' challenge in this court of this particular finding is probably not available to them now. Insofar, however, as appellants contend that the judgment is not supported by the findings of fact *and the evidence,* we will give the complaint consideration.

It will be noted that appellants do not challenge the remaining portion of finding of fact number 9. The remaining portion of that finding is:

"At and before the organization of the Austin Securities Company, the W. A. L. Thompson Hardware Company has been a profitable business. On January 1, 1930, the assets of the company were $1,029,550.69 and its liabilities, not including common-stock liabilities, were $254,742.80. During the last six months of 1929 and the first six months of the year 1930 the company had enjoyed the largest volume of business and profits in its history. During the last half of the year 1930 the volume of its business declined approximately forty percent and continued to decrease until 1933 when the volume of business was sixty-eight percent less than in 1929, with some increase since 1933. . . . on account of the decrease in volume of business due to the business depression which began in the fall of 1929 and which still continues. No dividends have been paid upon the common stock of the W. A. L. Thompson Hardware Company since the transfer of the said twelve hundred shares of said common stock to the Austin Securities Company."

The unchallenged evidence in the foregoing finding of fact together with other undisputed facts reflect rather vividly the financial reverses of the hardware company between the period of January 1, 1930, and April 30, 1935. Assets of the hardware company decreased $246,081.09. This calculation allows the hardware company full credit for questionable assets in the sum of $281,008.50. During that same period the liabilities of the hardware company increased $314,994.49. (Findings of fact 9, 25 and 26.) On the face of these figures it would appear that there was strong and abundant evidence that between January 1, 1930, and April 30, 1935, the hardware company had operated at a loss. The fact, if it be a fact, that at some particular time during that period the company did not operate at a loss is not important on the issues presented by this appeal.

Appellants complain about that portion of finding of fact number 40, which reads:

"The hardware company *will pay no interest* on these loans (referring to the loans made to the hardware company by the securities company), as long as the banks and trade creditors of said hardware company insist that the indebtedness of the hardware company to the Austin Securities Company be subordinated to their claims."

No exception was made to the trial court to any portion of finding of fact number 40. A letter, under date of June 21, 1935, was sent by the hardware company to creditors which contained the following statement: "No payment is being made to the Austin Securities

Company." Another letter was sent to the same creditors by the hardware company under date of June 20, inclosing a check in payment of twenty-five percent (25%) of the amount owing each bank and trade creditor as of June 1, 1935. It appears to this court that a reasonable construction of the two letters is that they conveyed the thought that no payments would be made to the securities company during at least a five months' period, beginning July 1, 1935. This construction is clearly supported by the unchallenged finding of fact number 24.

2. Appellants' second contention is that the other findings of fact do not support the conclusions of law, and require judgment for defendants.

In our opinion this contention is unsound for at least three reasons:

First, a judgment cannot be predicated upon isolated facts. The findings of fact must be considered as a whole.

Appellants have isolated seven of the forty-two findings of fact. Decisions of this and other courts are cited which it is contended apply to those particular isolated facts. Upon those isolated facts and those decisions it is contended that the judgment must be reversed. With that conclusion this court cannot agree.

In the early case of *Beaubien v. Hindman,* 37 Kan. 227, 228, 15 Pac. 184, this court said:

"It has always been held by this court, that a finding of fact by the court is equivalent to a verdict by a jury."

In the case of *Greiner v. Greiner et al.,* 129 Kan. 435, 283 Pac. 651, it was held that:

"Special findings returned by the jury are to be considered together, and, if possible, are to be so construed as to harmonize them, and to uphold the general verdict." (See cases cited therein.)

The same principle was announced in the case of *Parmenter v. Morrison,* 130 Kan. 707, 710, 228 Pac. 582, in which the rule was stated thus:

"The rule is that a general verdict and special findings should be harmonized, if possible; that every reasonable presumption is indulged in favor of the general verdict. (See, also, *Moore v. Connelly,* 119 Kan. 35, 237 Pac. 900.)"

In the case of *Lesher v. Carbon Coal Co.,* 127 Kan. 34, 272 Pac. 155, it was held:

"In the consideration of the question of inconsistency between the answers to special questions and the general verdict nothing will be presumed in aid

of the special findings and every reasonable presumption will be indulged in favor of the general verdict.

"Where special findings are fairly susceptible of more than one interpretation the one which harmonizes with the general verdict should be adopted rather than the one which points to inconsistency." (Syl. ¶¶ 1, 2.)

Appellants isolated findings numbered 29, 30, 31, 32, 35, 37 and 38. Those findings ignored numerous other important findings, such as the facts concerning the critical financial condition of the hardware company; the fact that the common board of directors was purporting to represent both the creditor and the debtor; that the securities company board is holding no meetings to consider or determine its rights or business policies; that the securities company board has failed and neglected to consider its claim against the hardware company; that it failed and neglected to consider its legal rights under the repurchase agreement; that the directors of both companies were the same; that the financial affairs of the hardware company were dictated by its bank and trade creditors to their advantage by obtaining preferences in their favor; that the only claim of substantial value held by the securities company is its claim of $227,688 against the hardware company; that no interest is being paid by the hardware company on this claim; that interest is the sole source of profit for the securities company, and that by reason of the failure of the hardware company to pay interest thereon the securities company cannot carry out the fundamental purpose for which it was chartered. (Findings 9, 25, 40, 42, and findings of fact contained in conclusion of law number 4.)

Second, appellants are entirely right in their contention that the board of directors or trustees have the general management of the affairs of the corporation. (R. S. 17-608.)

A receiver was not appointed in violation of that statutory provision.

A reading of all the findings of fact discloses that the receiver was appointed by reason of the *failure* and *neglect* of the defendant directors, *as a board of directors* of the securities company, to *consider* the claims and rights of the securities company against its debtor, the hardware company, and because its board of directors *failed* and *neglected* to *consider* the contention of other creditors of the hardware company that their claims were superior to the claims of the securities company, and by reason of the further fact that the defendant directors, as a board of directors of the securities com-

pany, took no action to determine the question of parity of claims before and while its debtor, the hardware company, was preferring other creditors by a twenty-five percent (25%) payment of their claims.

The receiver was appointed for the further reason that the defendant directors of the securities company as a board of directors *failed* and *neglected* to *consider* the legal rights of the securities company under the so-called repurchase agreement. (Finding 42.)

The findings as a whole clearly disclose that the receiver was appointed by reason of mismanagement of the securities company and that this mismanagement consisted in the failure of the board of directors of that company to function as to definite and specific matters which affected its most vital assets. Those derelictions are summarized in the last finding of fact, number 42.

In consideration of all of the findings of fact the trial court made conclusion of law number 4. Appellants contend this conclusion of law contemplates the right of a court of equity to substitute its business judgment for that of the directors. Not at all. This court does not propose to sit at the directors' table of private enterprise and dictate its business and economic policies by substituting its theories for the judgment of men duly elected to administer that trust. That, however, is one thing. The failure of the board to function is another.

Finding number 42 shows that no meetings of the securities board are being held—that its board has failed and neglected to consider the two most vital problems confronting that company, namely, the question of subordinating its claim which constituted its only asset of substantial value and the vital question of its legal rights under the repurchase agreement. This last agreement will be analyzed later. The securities board is not attempting to consider—much less determine—the business and financial policies of its company. In other words the board has failed and neglected to function. It has abandoned the administration of the company's affairs. And that is not all of the difficulty. The securities company and the hardware company have the same identical directors. The hardware company owes the securities company. It also owes bank and trade creditors. The financial affairs of the hardware company are dictated by its bank and trade creditors to their benefit by obtaining preferences over the securities company. The board of the securities company is holding no meetings, considering and determin-

ing upon no financial policy for the securities company and permitting the preferences to be made.

The general management and the financial policies of a corporation must be determined through its board of directors. R. S. 17-608 provides: "The directors or trustees shall have the general management of the affairs of the corporation."

"The directors possess authority to act only as a board at a regularly assembled meeting. The individual and separate action or assent of one, or a majority, or all the directors, does not bind the board or the corporation. And this is equally the rule, although the director who assumes to act may own a majority of the shares." (14a C. J. 84, and cases cited.)

The above rule is so generally and firmly established, it is considered unnecessary to refer to many decisions. In the case of *Chavelle v. Washington Trust Co.*, 226 Fed. 400, it was held:

"The minutes of the board of directors of a corporation having seven trustees purported to show the adoption at a meeting of the directors of a resolution to deliver bonds secured by a deed of trust, the issuance of which had previously been authorized, to a creditor as collateral security. In fact, however, no meeting was held, and the resolution was merely sent to the secretary, who signed it and called two of the other trustees to the office, one of whom signed it in the presence of the other and the other of whom signed it without any other trustee being present. The resolution was then sent to two of the other trustees, who signed it without any other member of the board being present. *Held,* that the purported resolution was invalid, and the bonds were issued without authority and were void."

In the case of *Ames v. Goldfield Merger Mines Co.*, 227 Fed. 292, a receiver was appointed. That case has many features in common with the instant case, including some of the contentions made by the parties here. The necessity for corporate action is clearly set forth. The right to relief by a minority stockholder through the appointment of a receiver was upheld. In that case it was said:

"(1) The issue is: Have the directors of this company abandoned the company? Have they turned the management of its business over to others, and is the business of the Merger Company now being administered by the officers or employees of other companies, whose business is or may develop antagonistic to the best interests of the Merger Company? The stockholders of a corporation have a right to expect from their directors a conscientious consideration of every proposition which is presented which involves any interest of the company, in conformity to the oath which they have subscribed. They have a right to have the individual viewpoint of the several directors expressed at a conference, for the purpose of obtaining the exchange view of the several persons in arriving at conclusions after deliberate consideration of any issue. It is fundamental that officers of boards can only act as such con-

stituted boards when assembled as such, and by deliberate and concerted action dispose of the issue under consideration, and that they cannot act in an individual capacity outside of a formal meeting, and a majority of the individual expressions be the action of the board. The law believes that the greatest wisdom results from conference and exchange of individual views, and it is for that reason that the law requires the united wisdom of a majority of the several members of the board in determining the business of a corporation, and will not permit the business and concerns of a corporation to be delegated to any officers or men, however capable, or however high their standard for integrity and honesty may be, and that fraud will be implied upon the delegation of such power and right, and the exercise thereof by men who may be the controlling stockholders, even though, in their own conscience, they may believe that everything has been done to the very best interests of the concern; and this is emphasized when the records show that large sums of money have been expended with no beneficial results to the concern, but which do show great benefits to other concerns in which these majority stockholders likewise own large interests, as in this case. It is the abuse of corporate license or power which reflects upon corporate control and casts suspicion upon large corporate holdings. It is the failure to give that consideration to the interests of the minority which the majority would have them give were the positions reversed. The law, therefore, wisely places control of corporations in a board of trustees, and requires its action as a board.

"(2) Counsel for defendants say that complainant has another remedy, and that a court will not take the control of the corporation from the board of trustees while other remedies are available; that the parties against whom complaint is made are solvent, and that the minority stockholders can bring an action on behalf of the corporation, however, at their own expense; that the majority stockholder has a right to dictate the policy and business affairs of the corporation, irrespective of the desire of the minority, so long as no fraudulent, dishonest, or oppressive conduct is shown; and that the conduct shown in this case is sanctioned and approved. It is said that many men are directors in many different corporations which have contractual relations, and that a court will only see whether the dealings, contracts, etc., are fair, whether the boards have acted impartially; and by that criterion shall the court conclude this issue." (p. 301.)

The court in summarizing the issues in that case said:

"From the record it appears that the directors of the defendant company held four meetings in nearly as many years. The officers made no report to the stockholders. No meeting of the stockholders was called for more than three years. More than $250,000 was expended, practically all of the available funds, during this period of time. This expenditure was directed by officers of other companies controlled by the majority stockholders of the Merger Company, and not by the trustees of the defendant company. $199,000 was spent on a shaft and tunnels which developed nothing for the Merger Company, but did for other companies. No contract was entered into by the board of directors with the other companies for any contribution or sharing

of expenses. Stock owned by the defendant company was sold for less than $50,000 by officers of other companies, and not by the board of directors, which within a short time was worth $500,000. The officers who sold the stock were officers of the company for whose benefit the shaft was operated, to pay the expenses of which the stock is claimed to have been sold. *The entire record in this case is redolent with facts showing that the business of the Merger Company was not and is not conducted by the trustees.* (Italics ours.) The fact that the trustees were nominal stockholders is not material. A man need not be a large shareholder to be a trustee, but he must exercise his integrity and his judgment in behalf of the corporation which he represents; nor can he be held responsible for error in judgment, but he cannot be permitted to turn his trust over to others to exercise for him, even though the administration by others of the trust may, in the judgment of such other persons, be honestly carried out.

"Under the circumstances disclosed in this case, I do not think that there is an adequate remedy at law. *Where the business and affairs of a mining corporation are taken over by the agents and officers of other concerns whose controlling shareholders also control such mining corporation, and the business of such mining corporation is managed in the interest of such other concerns, and the minority stockholders deprived of their just rights, I think there is a liability in equity, and that there is no more valuable function that a court of equity can, under such circumstances, perform, than to protect such minority, and that a court of equity is the only tribune to afford an effective remedy.* (Italics ours.)

"From all of the testimony that was presented, the admitted facts, and the indisputable proof upon the issue, it is conclusively established, to my mind, that the Merger Company's identity is practically lost; that its affairs are not and have not been administered by its board of directors, and that the corporate life, except as mere form, has been abandoned, and the administration of its affairs turned over to the executive and administrative officers of the Goldfield Consolidated Mines Company and allied concerns; that the policy of all of the business of the Merger Company has been planned and carried out by the officers and persons who dictated and directed the policy and business of the Goldfield Consolidated Company and allied concerns, and not by the trustees of the Merger Company, and the interest of the Merger Company has not been subserved in the manner it should have been, but that the Merger Company's affairs have been and are being administered in the interest and in behalf of the Goldfield Consolidated Mines Company and allied companies." (p. 302.)

It is insisted in the instant case that the bank and trade creditors urged upon the hardware company that their claims were superior to those of the securities company. This court is deciding nothing and implying nothing concerning the merit of that contention. That issue is not before us now. The bank and trade creditors are not parties to this suit. The issue under consideration is the failure of the securities board to function.

It is insisted that no contract for subordination of the claim of the securities company had been entered into. True it had not been signed. The trial court found that it was the intention of the defendants to enter into such agreement. (Finding 36.) That fact is not challenged. It is admitted. The trial court further found that after the service of the restraining order upon each of the individual defendants, restraining each of them from entering into such agreement, the hardware company did make a payment of twenty-five percent (25%) to its other creditors without paying anything to the securities company. (Finding 24.) The letters to the creditors involving this payment· clearly disclose that no payment was being made to the securities company. The actual subordination of the claim of the securities company to the extent of twenty-five percent (25%), was therefore an accomplished fact at the time of the trial.

In this connection it should be noted that the restraining order did not legally bind the hardware company as it was not a party to this lawsuit. So far as preventing the actual preference of twenty-five percent (25%) or preventing any preference in the future is concerned, the restraining order, now a permanent injunction, has no practical effect whatsoever. It only enjoins the defendants from entering into a contract to subordinate its claim. Unless the order appointing a receiver is affirmed, the hardware company may continue to prefer its other creditors although its legal right so to do has never been determined. Herein again lies the clear, positive danger of loss or injury to the securities company and its stockholders.

The failure and neglect of the securities company to consider and determine its rights to parity of claims and to permit the preferences to be made has jeopardized and will continue to jeopardize the interests of the defendant securities company and the rights of its stockholders. Jeopardize means, "to expose to loss or injury; to risk." (Webster's International Dictionary.)

Appellants rely upon the well-reasoned case of *Inscho v. Development Co.*, 94 Kan. 370, 146 Pac. 1014, and other cases of similar import from other jurisdictions. They quote the following portion of the Kansas case:

"The appointment of a receiver for a solvent, going concern is a last-resort remedy and should not be employed to correct improper conduct when other adequate remedy is available. Bad judgment and ill success in previous ventures, completed or not being actively prosecuted, current transactions

merely unwise and not so reckless or extravagant as to amount to breach of trust, irregularities and misconduct which are not so culpable as to jeopardize the interests of the corporation and the rights of stockholders, and dissensions among directors, so long as a majority of them control, do not warrant the appointment of a receiver. In no case should a court take the property and business of a solvent, going corporation out of the hands of the board of directors and into its own hands by the appointment of a receiver at the suit of a minority stockholder unless the right of the plaintiff be free from reasonable doubt and the danger of loss or injury be clearly proved." (Syl. ¶ 1.)

It is urged that "the above language blankets the situation in the case at bar." This court agrees. It is convinced that this plaintiff's rights are free from reasonable doubt and that the danger of loss or injury is clearly proved.

Appellants cite the cases of *Chapman v. Irrigation Co.*, 75 Kan. 765, 90 Pac. 284, and *Bank v. Prescott*, 60 Kan. 490, 57 Pac. 121, and urge that those cases hold contracts between two corporations with a common board of directors valid unless fraud is shown. They do so hold. The trouble is those cases do not touch the issues in this case. They were suits on contract. This is a suit for the appointment of a receiver. In them there is no claim of failure on the part of the board to function, no evidence of mismanagement or that the common board was functioning in favor of one corporation to the risk or injury of the other. The questions presented there were simply whether one corporation could sue the other on a contract they had entered into. The question here is not whether the securities company could sue the hardware company on the contract of indebtedness. R. S. 60-1201 provides:

"A receiver may be appointed by the supreme court, the district court, or any judge of either, or in the absence of said judges from the county, by the probate judge: . . *Sixth*. In all other cases where receivers have heretofore been appointed by the usages of the courts of equity."

This court has had occasion to consider the above statute in previous cases in which boards of directors failed to function. In the case of *Bowen v. Flour Mills Corporation*, 114 Kan. 95, 217 Pac. 301, the board of directors failed to function. In that case the failure to function was due to a deadlock in the board of directors. This court in discussing that situation said:

"Courts of equity came into existence for the purpose of affording such relief as *justice and good conscience required,* under the peculiar circumstances of the case. In some jurisdictions, instead of keeping up with social progress, equity has set and hardened. Its potency to meet new conditions has been

emasculated, and frequently the caution to be displayed and the limitations to be observed in appointing receivers loom so large that, as the Missouri court has observed, judicial hesitancy degenerates into judicial atrophy. (*Cantwell v. Lead Co.*, 199 Mo. 1.) In other jurisdictions a better view is taken, and the phrase, 'by the usages of courts of equity,' means according to the informing spirit of equity heretofore manifested in the appointment of receivers." (p. 99.)

In this same case (p. 99) this court quoted with approval what was said in the case of *Boothe v. Summit Coal Min. Co.*, 55 Wash. 167, in which case it was said:

"In the instant case, there is no control of the corporation by a board of trustees, sustained by a majority of the stock, although originally the present board may have been legally elected. *In practical operation there is no deliberative board. R. J. Linden has as full, complete, and dictatorial control as did Oudin in the case cited, and although the corporation here involved is solvent, such a condition is inequitable and should not be permitted.* (Italics ours). It does violence to the elementary idea that a corporation is to be controlled by a governing board representing a majority of the stock. No majority is in control, nor can it obtain control. The deadlock is complete, absolute, to all appearances permanent, and R. J. Linden arbitrarily controls and manages the estate of Boothe, whose rights are, and should be, equal to his, . . . (p. 177.)"

This court in the Bowen case (p. 99) also quoted the following portion from the opinion in an Idaho case, where the rule was stated thus:

" 'The early doctrine that the affairs of a corporation could not be inquired into except by permission of the attorney general, and that courts of equity should not interfere with the power and authority of the directors of a corporation because that would result in its dissolution, has been modified to meet existing conditions. A large part of the business of the world is done through corporations, and it was held in *Columbia Athletic Club v. State,* 143 Ind. 98, 52 Am. St. Rep. 407, 40 N. E. 914, 28 L. R. A. 727, that the courts of equity should adapt their practice as far as possible to the existing state of society, and apply its jurisdiction to all those new cases which, from the progress daily making in the affairs of men, must continually arise, and should not from too strict an adherence to the forms and rules established under very different circumstances, *decline to administer justice and to enforce rights for which there is no other remedy.'* (Italics ours.) [*Gibbs v. Morgan,* 9 Idaho 100, 114.]"

In the Bowen case this court further quoted with approval a portion of the opinion in the case of *Boothe v. Summit Coal Min. Co.,* supra, which we believe to be applicable to the instant case and which reads:

"'While we recognize and adhere to the doctrine that a court of equity should hesitate before appointing a receiver over a solvent corporation, and should make such an appointment in exceptional instances only, yet we are constrained to hold that equity, good conscience, justice, and the rights of the parties demand such an appointment in this case.' (p. 179.)" (p. 100.)

This court, in its opinion in the Bowen case (p. 100), further said:

*"In equity, impossibility of attaining corporate objects* is as good ground for putting an end to operations as inevitable insolvency (1 Morawetz, 284, 285, and cases cited), and if it shall be found impossible for this corporation to function as a corporation through its own proper agencies, no reason is apparent why its business should not be wound up and the assets distributed."

The trial court in the instant case found that the subordination of the claims of the securities company made it impossible to attain its corporate objects. (Finding 40.)

In the case of *Nelson v. United Elevators Co.*, 115 Kan. 567, 569, 223 Pac. 814, there existed dissension on the board of directors amounting practically to a deadlock, and this court in that case quoted from 4 Pomeroy's Equity Jurisprudence (4th ed.), section 1537, as follows:

"'The inherent jurisdiction of a court of equity to appoint receivers of corporations, in proper cases, independently of statutory authorization, has been frequently recognized. The cases in which the power is most frequently invoked are as follows: (1) *In suits by stockholders seeking a remedy for breaches of their fiduciary duty by the directors or officers of the corporation.* . . . (3) When the corporation has no properly constituted governing body, or there are such dissensions in its governing body as to make it impossible for the corporation to carry on its business with advantage.'

"In section 1541 of the same work it is said:

"'Notwithstanding many dicta, and the assertions of the older textbooks, the current of recent authority appears to be strongly in favor of the inherent power of the court, in a proper case, to displace the management of guilty or *negligent* [italics ours] officials by the instrumentality of its receiver. It has been frequently pointed out that the appointment of a receiver in cases of this character does not necessarily result in the dissolution or extinction of the corporation.'" (p. 570.)

In each of the foregoing cases the board of directors failed to function, by reason of a deadlock in the first case and by reason of dissension which practically amounted to a deadlock in the second case. In the instant case we have a complete failure to function by reason of the fact that the board did not meet at all. At least it had not met for any purpose since the death of Mr. Austin, during which time the securities company's claim was being subordi-

nated. The reason for failure to function is not so important. The failure to function is vitally important.

In this case the directors for the securities company were identical with the directors of the hardware company. The trial court found that the financial affairs of the hardware company were being dictated by a class of creditors to their benefit by obtaining preferences over the securities company. This fact may account for the failure of the board of directors of the securities company to hold any meetings and take any action adverse to the bank and trade creditors. Whatever the cause for failure to meet and transact its business in a corporate manner may be, it remains a fact that the board of directors of the securities company did not function.

There is another significant transaction between the hardware company and the securities company which demands our attention. We refer to the so-called repurchase agreement. The board of the securities company has failed and neglected to give consideration to its legal rights thereunder. (Finding 42.) That contract of January 20, 1932, nowhere appears in any minutes of the securities company. The securities company had no financial committee. All of its financial transactions were conducted by Robert B. Austin. (Finding 17.) He was also president of the hardware company. The repurchase agreement was signed by him as president of the hardware company and by E. C. Kieswetter, vice-president of the securities company. This agreement is quite lengthy and we shall only consider such portions of it as will clearly indicate that it has required and now requires prompt attention in order to preserve the rights and interests of the securities company.

This agreement deals with an indebtedness of the hardware company to the securities company in the sum of $127,000. Before the execution of that agreement, this debt was represented by notes, secured by certain collateral. Under the agreement the securities company surrendered to the hardware company those notes and that collateral except one item of the collateral to which we shall refer directly. In consideration of the surrender of these notes and collateral, the hardware company sold to the securities company for $127,000 this same collateral, except the one item of collateral, to wit: Five hundred shares of no-par common stock of the securities company. That stock was to be retained by the securities company as collateral to secure the payment of the interest agreed to be paid under this contract and to guarantee the performance of

the terms of this contract by the hardware company. Paragraph eight of the repurchase agreement further provided that—

"500 shares of no-par common stock of the securities company may, . . . (d) in case said securities company shall at any time or times hereafter deem itself insecure under this repurchase agreement and guaranty, be sold, transferred and delivered by said securities company, without previous demand, advertisement or notice, to said hardware company, either at public or private sale at the option of said securities company, with the right on the part of said securities company to become the purchaser and absolute owner thereof, free of all trusts and claims; and the proceeds derived from the sale thereof shall be applied less costs of sale to any liability of the hardware company arising hereby to said securities company or any other liability or liabilities of the hardware company to said securities company then due or owing."

Whether the repurchase contract is a valid and binding agreement is not now before this court. Assuming, without now deciding, that this is a valid contract, the securities company must elect to demand that the hardware company repurchase what was sold or the securities company becomes the owner thereof. The trial court found that the collateral held by the securities company was without market value, was of doubtful value and wholly inadequate to secure the payment of the money due the securities company. (Finding 18.)

It will be readily observed that if the securities company does not insist upon the repurchase by the hardware company, that the original indebtedness in the sum of $127,000 will vanish from this transaction. It will also be noted that if the securities company does require the hardware company to repurchase this former collateral the securities company is entitled under this contract to a new note or notes, but not to its original security therefor. If the contract is valid, then under paragraph eight quoted above, the securities company, if it deems itself insecure, has a right to sell only the 500 shares of no-par common stock of the securities company and apply the proceeds on its claim against the hardware company. The hazardous financial condition of the hardware company has received previous consideration and requires no repetition here. The questions involved in the repurchase contract are clearly so important to the very financial existence of the securities company as to have required consideration from its board of directors long ago. Again, however, its board failed to function as to this item of business. (Finding 42. See, also, conclusion of law number 4.)

Mr. Collis, a director of the securities company, and of course also a director of the hardware company, testified concerning this vital document, as follows:

"BY THE COURT: Does this board of directors discuss what they are going to do with this repurchase agreement? A. No, we haven't. The all-important thing to both companies is to know whether we are going to continue or not, and as soon as that is determined we will get together and discuss what to do.

"BY THE COURT: Has the question of legality of that contract been up before the board or with the attorneys? A. Which company?

"BY THE COURT: The securities company. A. No, as we have had no meetings. It has been talked in general."

Failure of the board to consider the legal rights and interests of the securities company in the light of the critical financial condition of the hardware company has jeopardized and is jeopardizing the interests of the securities company and the rights of its stockholders. Here again this court is of the opinion that the rights of the plaintiff are free from reasonable doubt, and that the danger of loss or injury is clearly proved.

Appellants contend that the court found there was no fraud on the part of any of the defendants to this action. That is correct. No fraud was pleaded by plaintiff as to the subordination of claims or as to the repurchase agreement. The fraud pleaded by plaintiff related to the original transfer and exchanges of stock between these corporations. The question was also raised by plaintiff as to the legal inability of the directors to act for the securities company. The trial court found that the exchange of the 36,000 shares of the common stock of the securities company for the 1,200 shares of the common stock of the hardware company is not void, and is not voidable at the suit of a common stockholder of the securities company who purchased his common stock after such exchange of stock. The trial court further found the defendant directors of the securities company are the legal directors of that company. Appellees contend these conclusions of law are erroneous. There has been no cross-appeal as to either of these findings. These questions are not before us, hence we are not deciding the question of their validity. It is not necessary to decide them in order to determine the validity of the appointment of a receiver. The trial court decided this lawsuit on the principle of mismanagement and not on the theory of fraud or the legal inability of the directors to function.

The trial court found that the directors of the hardware com-

pany, who are also the directors of the securities company, are more interested in the hardware company than in the securities company, and pointed out the reasons therefor. (Finding 37.) It is obvious that a mere failure of the securities board to exercise its option under the repurchase agreement might readily eliminate the whole perplexing question of parity of claims to at least the extent of $127,000. Such a short cut would at least tend to deprive the securities company and its stockholders of their day in court on the question of parity of claims to that portion of the indebtedness. Failure on the part of the securities board to demand repurchase by the hardware company would also ease the load of the hardware company's indebtedness in that same amount. It would jeopardize the interests and rights of the plaintiff and other stockholders of the securities company to that same extent.

It is strongly urged in one of the briefs resisting the appointment of a receiver that consideration by a court of what the securities company board would do about this repurchase contract would be dealing with possible future conduct and not with past conduct. Our answer is that the failure of the securities board to even consider what its action should be as to this contract is past and not future conduct.

A third reason why appellants' contention cannot be sustained is that in this case the common board of directors is purporting to function in a dual and inconsistent capacity. It is purporting to represent adverse legal rights and interests. It is in the position of representing both the creditor and the debtor. The facts show, as previously indicated, that the rights and interests of the securities company have been jeopardized in order to save the hardware company. This has been done on the theory and with the hope that if anything remains the securities company will be paid eventually.

No just, no equitable reason appears to this court why the moneys paid to other creditors should not have been impounded to abide a decision on parity of claims. Here not only was that neglected, but the securities board failed to consider its legal rights in the matter. (Finding 42.) Without such consideration it stood by and permitted the preferences.

Appellants argue that the interests of the securities company and hardware company are not adverse. With that contention we cannot agree. The evidence clearly shows the contrary. Appellants' contention in that regard is based upon questions of business policies

and judgments which they claim would be to the best interests of all concerned. That has nothing to do with the question of adverse legal rights and interests. The stockholders in the two corporations are not all the same. The interests of the corporations are not the same. . The interest of the securities company revolves about its right to have its claim against the hardware company paid. The interest of the hardware company is to have that claim subordinated. The interest of the hardware company under the repurchase agreement would be to let the securities company become the owner of the collateral. The collateral was found by the trial court to be without market value, of doubtful value and wholly inadequate. (Finding 18.) The interest of the securities company would therefore appear to demand the repurchase of the collateral by the hardware company.

Appellee cites decisions and statements of text writers which he contends support the proposition that contracts such as, or similar to, the repurchase agreement entered into by a common board of directors have been held void or voidable. Other decisions are cited which it is contended hold that such contracts are presumptively fraudulent. We deem it unnecessary to determine that question now.

Appellants insist there is nothing inherently wrong or illegal about two corporations having a common board of directors. That may be readily admitted. In this case we have a common board purporting to act in dual and irreconcilable capacities. Even this modern age, with its interlocking and common directorates, may well give heed to the ancient Biblical admonition, "No servant can serve two masters" (Luke 16:13). In the instant case the common board is in the position of being obliged to serve three masters: first, the hardware company, a debtor; second, the securities company, the creditor of the hardware company; and third, the bank and trade creditors of the hardware company, whose interests are squarely adverse to those of the securities company. It is clearly obvious that the common board, in the best of faith, occupies an unsatisfactory if not wholly untenable position. Under the peculiar circumstances in this case, it is the opinion of this court that the securities company, in fairness, justice and equity, is entitled to an independent agency to consider, determine and protect its rights and interests.

It is also contended that the appointment of a receiver amounts to

abuse of judicial discretion. This court in receivership cases has previously held that the appointment of a receiver rests so largely in the discretion of a trial court that this court will not disturb its judgment unless it is evident that reasonable discretion has been abused. (*Fluker v. City Rly. Co.*, 48 Kan. 577, 30 Pac. 18; *Nelson v. United Elevators Co.*, 115 Kan. 567, 570, 223 Pac. 814.) The defendants in this lawsuit are, under the positive finding of the trial court, absolved from fraud. The trial court found that the failure of the board of the securities company to function amounted to mismanagement and that a receiver should be appointed. There was abundant evidence to support the judgment. In our opinion the trial court did not abuse sound judicial discretion.

The judgment is affirmed.

BURCH, C. J., HUTCHISON and SMITH, JJ., are not satisfied the district court was authorized to appoint a receiver, and so withhold assent to affirmance of the judgment of the district court.